Vacated and remanded by published . opinion. Judge DUNCAN wrote the majority opinion, in which Judge DIAZ joined. Senior Judge DAVIS wrote a dissenting opinion.
DUNCAN, Circuit Judge:
Appellee William Gault (“Gault”) terminated Appellant Melanie Lawson (“Lawson”) from her position as a deputy clerk in the Clerk of Court’s Office of Union County, South Carolina. Lawson filed suit, challenging her termination on First Amendment grounds. Gault moved for summary judgment, and the.district court granted the motion, holding that Lawson occupied a confidential or policymaking position and was subject to termination for campaigning against her boss. We disagree that Gault has established as a matter of law that Lawson held a position for which political loyalty was required, and we are unable to affirm on any other grounds based on the record as currently presented. We therefore vacate the judgment below and remand for further proceedings consistent with this opinion.
The dissent is so hyperbolic that it seems necessary to stress exactly what is at issue in this appeal. The majority simply reverses the grant of summary judgment to Gault and remands. What the dissent is so exercised about is that the majority does not grant summary judgment to Lawson, who never moved for summary judg *244 ment nor otherwise sought such relief. To the extent there is anything remarkable about this opinion, either jurisprudentially or otherwise, it is the dissent’s determination to overleap precedent and procedure, and preclude the development of any record evidence, solely to grant Lawson relief she did not ask for and which Gault had no notice of. As we explain below, the issue before this court on appeal is narrow: whether Gault’s motion for summary judgment had merit. We conclude that it did not, and our opinion steps beyond that simple question only insofar as we must address the dissent’s gratuitous overreach.
I.
A.
This action arises out of Union County, South Carolina’s 2012 election for Clerk of Court. Because of the unique statutory characteristics of that position, we begin by describing it briefly.
The South Carolina Constitution creates the position of Clerk of Court for each county. S.C. Const, art. V, § 24. The Clerk is elected to a four-year term through partisan elections, with the Governor empowered to fill any vacancies that arise between elections. S.C. Code Ann. § 14-17-30. The General Assembly prescribes the Clerk’s duties. S.C. Const, art. V, § 24. The Supreme Court of South Carolina approves guidelines for the Clerk in connection with the court’s responsibility to make rules of court administration. Id. art. V, § 4; see, e.g., Administrative Order Adopting Clerk of Court Manual Revision, S.C. Sup. Ct. Administrative Order No. 2014-05-21-01, dated May 21, 2014, http://www. judicial.state.se.us/courtOrders/display Order.cfm?orderNo=2014-05-21-01. The Clerk is essentially responsible for all the duties typically associated with court administration. See S.C. Code Ann. §§ 14-17-210 to 14-17-760.
South Carolina law authorizes the Clerk to appoint deputy clerks to aid in executing the Clerk’s statutory duties. Id. § 14-17-60. Once sworn into office, a deputy clerk is authorized to carry out any of the Clerk’s statutory duties. See id. A deputy clerk serves at the pleasure of the Clerk. See id.
The Supreme Court of South Carolina has issued a Clerk Manual, which emphasizes the Clerk’s “public relations” role as the sole face of the state court system for many individuals. See Clerk of Court Manual § 1.21 “Public Relations,” http://www. judicial.state.sc.us/ClerkOfCourtManual/ displaychapter.cfm?chapter=l#1.21. In the Family Court/Child Support Division, where Lawson worked, the sensitive nature of the proceedings gives the Clerk’s public relations role greater importance. See id. § 7.18, “Confidentiality in the Family Court,” http://www.judicial.state.sc.us/ clerkOfCourtManual/displaychapter.cfm? chapter=7#7.18.
Because all Family Court filings are submitted through the Clerk, the Family Court/Child Support Division of the Clerk’s Office routinely handles sensitive filings. Cases concerning legal infractions by minors, child neglect and abuse, child custody, divorce, adoption, termination of parental rights, and spousal and child support all originate in Family Court. S.C. Code Ann. §§ 63-3-510, 63-3-530. Further, many Family Court filings, unlike most court documents, are strictly confidential. See, e.g., id. § 44-41-32 (uneman-cipated minors seeking abortions without parental consent); id. § 63-19-2040 (alleged state law violations by minors); id. § 63-9-780(B) (adoptions). In addition, South Carolina law protects the integrity of filings related to adoptions by making it a misdemeanor, punishable by fine and *245 imprisonment, to disseminate or allow the unauthorized dissemination of such records. Id. § 63 — 9—780(F)(2). The Family Court/Child Support Division of the Clerk’s Office is also responsible for managing the child support account and working with other staff in the Clerk’s Office to process the account’s monthly statements. See J.A. 96.
B.
Lawson was an employee in the Union County Clerk’s Office from 1992 until 2012, beginning as a child-support clerk under June Miller (“Miller”), who at that time was the Clerk of Court. Miller named Lawson the Family Court coordinator before Miller retired from her position as Clerk in 2003.
Lawson continued to work in the Family Court/Child Support Division under Miller’s successor, Brad Morris (“Morris”). Morris served as Clerk from 2003 until October of 2009, when he resigned after pleading guilty to embezzling more than $200,000 in public funds from the Clerk’s Office. During his term in office, Morris stole cash receivables and falsified deposit slips, beginning with funds from child support receivables and eventually including accounts across the Clerk’s Office. Lawson applied for appointment to the vacant position after Morris resigned, but the Governor appointed William F. Gault to serve as Clerk through the next election cycle instead.
At the time Gault took over as Clerk, the office had ten full-time staff members. Gault thereafter received approval and funding from the Judicial Council[1] to hire Miller, the former Clerk of Court, as a part-time employee for six months. The parties have stipulated that Gault hired Miller “to perform bank reconciliations in an effort to prevent another lapse like the one that had allowed Mr. Morris to embezzle hundreds of thousands of dollars from the Clerk’s Office.” J.A. 20.
Gault retained Miller after the six-month period ended, paying her with funds from the child support account. He also selected Lawson to supervise the Family Court/Child Support Division of the Clerk’s Office as his deputy. In their respective capacities, Lawson and Miller would interact when Miller had questions about the monthly child support account statements.
C.
Gault opted to run for a full term as Clerk in the November 2012 election, entering the race as a Republican. On March 30, 2012, Lawson declared her candidacy for the Democratic primary,[2] with plans to oppose Gault in the general election. After Lawson informed Gault of her action, Gault placed her on unpaid leave for the duration of her campaign.
Lawson acknowledges that, as her campaign progressed, June Miller became a campaign issue. According to Lawson, she “made statements concerning June Miller’s employment with the Clerk’s Office.” J.A. 186. Specifically, Lawson expressed concern over “where the funds were coming from to pay Ms. Miller,” given that Miller continued working after her six-month au *246 thorization expired. Id. Lawson explained that she “had a heightened sense of alertness, especially when it involved funds of the Clerk’s Office” given Morris’s embezzlement scandal. J.A. 187.
Shortly after his election, Gault set up a meeting with Lawson. At that November 14, 2012, meeting, Gault terminated Lawson, telling her that “he had to do what was in the best interest of the office.” J.A. 21. Gault would later testify that he terminated Lawson in part for making statements during her campaign regarding Miller’s employment at the Clerk’s Office, and in part because he was concerned that her continued employment would undermine his authority as Clerk.
Gault explained that, on numerous occasions during the campaign, it was brought to his attention that Lawson was making statements identifying Miller by name. These statements questioned Gault’s decision to continue to employ Miller given that the “county council doesn’t want June Miller there.” J.A. 88. Moreover, Gault was told that Lawson was making statements to the effect that “June Miller should not be in the clerk of court’s office” and “June Miller is already drawing her social security and her retirement.” Id. According to Gault, he “couldn’t very well bring [Lawson] back in and expect her to sit beside June Miller” and interact with the other employees in such a small office under these circumstances. J.A. 92.
D.
Following her termination, Lawson sued Gault in both his individual and official capacities, seeking monetary damages and an injunction ordering her reinstatement. In her complaint, she alleged that Gault fired her “because of her exercise of her right to run for public office thereby violating her First Amendment rights.” J.A. 8.
At the conclusion of discovery, Gault moved for summary judgment. In addition to asserting immunity defenses, Gault argued that the First Amendment did not prohibit him from firing one of his deputy clerks for “perceived political disloyalty.” J.A. 31. In making this argument, Gault relied on case law analyzing the Elrod-Branti doctrine, discussed infra, which addresses the First Amendment’s limitations on political patronage dismissals.
Lawson opposed the motion, asserting that the Elrod-Branti doctrine was inapplicable, and that “[w]hen a government employer retaliates against a government employee for exercising their First Amendment right to speech the appropriate analysis falls under the Pickering balancing test.” J.A. 115. Thus, Lawson urged the district court to apply Pickering, and not Elrod-Branti
The district court agreed with Gault, and found that Lawson could not establish that she had a First Amendment right not to be terminated after she challenged Gault in her election campaign. Lawson v. Gault, 63 F.Supp.3d 584, 591 (D.S.C. 2014). Specifically, the district court held that, although Lawson’s candidacy implicated her First Amendment rights, she was terminated legally because she occupied a confidential or policymaking position. Id. at 590. The district court noted Lawson’s Pickering argument, but centered its analysis on Lawson’s position as a “public employee in a confidential, policymaking, or public -contact role,” which is a factor drawn from the Elrod-Branti doctrine. Id. In other words, the district court resolved Gault’s motion based on the grounds Gault raised, and not on the alternative First Amendment doctrine that Lawson raised.
Having concluded that Lawson failed to establish a First Amendment violation, the district court granted summary judgment and declined to address the qualified im *247 munity and Eleventh Amendment immunity defenses that Gault had asserted in his motion. Id. at 591 n. 7, 592. This timely appeal followed.
II.
A.
Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). We review de novo the district court’s grant of summary judgment. T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 384 (4th Cir. 2012). We apply “the same legal standards as the district court” while “viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.” Id. at 385 (quoting Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009)). Our review is not limited to the grounds the district court relied upon, and we may affirm “on any basis fairly supported by the record.” Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 222 (4th Cir. 2002) (citing Korb v. Lehman, 919 F.2d 243, 246 (4th Cir. 1990)).
B.
This appeal implicates two lines of cases that grapple with the limitations on a public employee’s First Amendment rights. The first doctrine is the “Elrod-Branti” exception, upon which the district court relied. This exception flows from Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), which held that policymaking employees may be terminated for their political beliefs if “party affiliation is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 518, 100 S.Ct. 1287. The second doctrine, based on Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), provides that the First Amendment does not protect public employees when their speech interests are outweighed by the government’s interest in providing efficient and effective services to the public.
The district court held that Gault was entitled to fire Lawson under the Elrod-Branti exception, because she held a confidential, policymaking position that required political loyalty. For the reasons set forth below, we vacate the order granting summary judgment to Gault and remand for further proceedings. First, we conclude that the district court erred in granting summary judgment to Gault based on the Elrod-Branti exception. Second, we conclude that Gault has not demonstrated an entitlement to qualified immunity or Eleventh Amendment immunity. Third, we decline to resolve the Pickering balancing test on the present record. We address each of these issues below.
C.
We begin with the Elrod-Branti exception, which was at the heart of Gault’s motion for summary judgment and the district court’s order granting the motion. As we explain, Gault has not satisfied the criteria of the exception, because he has not demonstrated that Lawson’s position required political loyalty.
Elrod v. Burns and Branti v. Finkel held that “[t]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved.” Smith v. Frye, 488 F.3d *248 263, 268 (4th Cir. 2007) (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 64-65, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). This narrow exception to the First Amendment permits patronage dismissals of public employees in policymaking positions in order “to give effect to the democratic process.” Jenkins v. Medford, 119 F.3d 1156, 1161 (4th Cir. 1997) (en banc). To determine whether the exception applies, “the ultimate inquiry is not whether the label ‘policymaker’ or ‘confidential’ fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 518, 100 S.Ct. 1287.
In this circuit, our Elrod-Branti analysis follows a two-part test adopted from the First Circuit. Stott v. Haworth, 916 F.2d 134, 141-42 (4th Cir. 1990) (citing Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc)). Prong one of the inquiry asks, at a general level, whether the employee’s position requires “government decisionmaking on issues where there is room for political disagreement on goals or their implementation.” Id. at 141 (citation omitted). If this prong is satisfied, we proceed to the second prong, under which we look at the employee’s specific responsibilities, and “focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office.” Id. at 142 (citation omitted). The government must satisfy both prongs of Stott to establish the Elrod-Branti defense.
We turn now to the attributes of Lawson’s position as a deputy clerk, according to the evidence before us. Upon review of the general duties of deputies in the Union County Clerk’s Office, we conclude that none of the duties Gault has pointed to satisfy the first prong of Stott. Deputy clerks are generally responsible for administrative and ministerial tasks, such as keeping records and managing court accounts. We see no evidence the deputy clerks perform tasks that relate to “partisan political interests or concerns,” and thus we cannot conclude that party affiliation is relevant to an employee’s qualification to serve as a deputy clerk. Nader v. Blair, 549 F.3d 953, 960 (4th Cir. 2008); see also Stott, 916 F.2d at 141 (noting the Elrod-Branti analysis requires that the position, “no matter how policy-influencing or confidential it may be, relates to partisan political interests ... or concerns.” (internal quotations omitted)). Put another way, there is no evidence before us that a deputy clerk’s political ideology would affect the manner in which she performed her role as a deputy clerk. Critically, Gault has failed to show that his deputies were required to make decisions “on issues where there is room for political disagreement.” Stott, 916 F.2d at 141. Therefore, under the first prong of Stott, Gault has not demonstrated his entitlement to summary judgment.
Gault has also failed to point to evidence that would satisfy the second prong of Stott, under which we consider the specific attributes of Lawson’s position, as a matter of law. The deputy clerk overseeing the Family CourVChild Support Division is responsible for overseeing case intake, receiving filing fees, collecting and disbursing funds from the child support account, and tracking and reporting court data. Gault has not argued that a deputy clerk would be better suited to carry out these specific tasks if she espoused a particular political philosophy. Nor has he pointed to any specific policies that Lawson was responsible for setting.
*249 Gault has emphasized Lawson’s supervisory title, but that role, standing alone, does not tell us that Lawson was a policymaking employee. Though Lawson may have set internal agendas as a supervisor, our decision in Fields v. Prater makes clear that a supervisory employee does not automatically hold a position that is subject to the Elrod-Branti exception. 566 F.3d 381 (4th Cir. 2009). In Fields, we explained that an employee with supervisory power does not necessarily have broad policy setting power. Id. at 387. “If having power over subordinates were a sufficient condition for exemption from the requirements of the First Amendment, only the most low-level government employees would be protected from politically-based hiring and firing.” Id. Thus, the mere fact that Lawson was a supervisor did not make her a policymaker.
Citing this court’s en banc decision in Jenkins, Gault contends that the Elrod-Branti exception applies because Lawson, as a deputy, was Gault’s “alter-ego,” authorized by statute to perform all the functions of a Clerk of Court. Contrary to Gault’s view, Lawson’s statutory authority does not compel the application of the Elrod-Branti exception, and Gault’s reliance upon Jenkins in that regard is misplaced. In Jenkins, we held that several deputy sheriffs in North Carolina were lawfully terminated for political disloyalty. Jenkins, 119 F.3d at 1164. Our analysis focused on the fact that deputy sheriffs held a special position under North Carolina law, in that they “act[ed] in the name of and with powers conterminous with [their] principal, the elected sheriff.” Id. at 1163 (quoting N.C. Gen. Stat. § 17E-1). At the same time, we emphasized that the “principal” for whom the deputies acted was a political figure responsible for establishing a law enforcement agenda; it was therefore critical to our decision that the sheriffs deputies played a role in implementing these policies. Id. at 1162-63. Based on the current record, we cannot say the same for Lawson’s role as a deputy to Gault. Though Gault was an elected official, and Lawson did have the statutory authority to act on his behalf, Gault has not demonstrated that any of the duties Lawson carried out in his stead involved setting or implementing a policy agenda.
For the foregoing reasons, we cannot conclude, as a matter of law, that “party affiliation is an appropriate requirement for the effective performance” of Lawson’s former position as a deputy clerk.[3] Branti, 445 U.S. at 518, 100 S.Ct. 1287. Accordingly, we reverse the district court’s decision to grant summary judgment to Gault based on the Elrod-Branti exception.
D.
Gault next argues that, even if he has not established the Elrod-Branti defense, he is entitled to qualified immunity from suit for money damages in his individual capacity. According to Gault, the contours of the Elrod-Branti exception were not sufficiently clear when he fired Lawson in 2012.
Qualified immunity “shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person.” Meyers v. Baltimore Cty., 713 F.3d 723, 731 (4th Cir. 2013) (citing Harlow v. Fitzgerald, 457 *250 U.S. 800, 818, 102 S.Ct. 2727, 78 L.Ed.2d 396 (1982)). “This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.” Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 907 (4th Cir. 2016) (quoting Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).
As our analysis of the Elrod-Branti defense illustrates, Gault has not demonstrated, as he must, that Lawson was a policymaking employee for whom political association was an appropriate job requirement. We have repeatedly limited the Elrod-Branti exception to employees who occupy policymaking positions for which political association is relevant, and we think our precedent made this requirement sufficiently clear at the time Gault terminated Lawson. See, e.g., Nader, 549 F.3d at 959; Fields, 566 F.3d at 386; Jenkins, 119 F.3d at 1163-64.
In an effort to demonstrate that the law in this area is muddled, Gault cites a 1996 decision in which we held, in an unpublished opinion, that qualified immunity shielded a clerk of court who fired his chief deputy for disloyalty. Appellee’s Br. at 36 (citing Conner v. McGraw, 104 F.3d 358 (4th Cir. 1996) (unpublished)). This does not advance Gault’s argument, however, because the fact that the law was unsettled in 1996 tells us nothing about the state of the law nearly sixteen years later. As we have explained, the state of the law in 2012 would have put Gault on notice that political affiliation was not an appropriate requirement for administrative employees.
Thus, we conclude that Gault has not established the defense of qualified immunity, and we cannot affirm the district court’s judgment on that basis.
E.
Gault next contends that the Eleventh Amendment immunizes him from suit for monetary damages in his official capacity. We find this argument unpersuasive.
The Eleventh Amendment protects the states from suit in federal court, as well as “arm[s] of the State and State officials.” Bland v. Roberts, 730 F.3d 368, 390 (4th Cir. 2013) (internal quotations omitted). Our Eleventh Amendment jurisprudence differentiates “arms or alter egos of the state from ‘mere political subdivisions of [the] State such as counties or municipalities,’ which, though created by the state, operate independently and do not share the state’s immunity.” United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 651 (4th Cir. 2015) (alteration in original) (quoting Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002)). To determine whether an entity is an arm of the state, we consider four nonexclusive factors:
(1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State; (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity’s directors or officers, who funds the entity, and whether the State retains a veto over the entity’s actions; (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity’s relationship with the State [is] sufficiently close to make the entity an arm of the State. •
S.C. Dep’t of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, *251 303 (4th Cir. 2008) (alteration in original) (internal quotation omitted).
Applying the Hoover factors to the record before us, we see no evidence that the Clerk’s Office is anything but a county agency that operates locally as an independent subdivision of the state. Significantly, Gault has not argued that a judgment against Gault would be paid from the state treasury. Additionally, the “Handbook for County Government in South Carolina” indicates that the clerk of court and his office draw their funding from the county, and not the state, which suggests that the Clerk’s Office operates autonomously from the state. J.A. 198.[4] Further, Gault’s authority as Clerk of Court was limited to Union County, suggesting that he dealt with only local, and not state, concerns. Based on this evidence, we cannot conclude that the Clerk’s Office is an arm of the state of South Carolina.
In support of his Eleventh Amendment defense, Gault points to nothing more than a paragraph of Lawson’s complaint that calls the Clerk’s Office a “state office” and an 1883 decision from the Supreme Court of South Carolina that characterizes a clerk of court as “State officer” for electoral purposes, State ex rel. Anderson v. Sims, 18 S.C. 460, 463 (1883). See Appellee’s Br. at 41. Neither the 1883 case nor Lawson’s complaint resolve the Eleventh Amendment question before us, because Gault must do more than simply establish a link between the state and his office. Instead, Gault must demonstrate that the Union County Clerk’s Office is an arm of the state, and not an independent subdivision of the state. Gault’s conclusory assertion that the Clerk of Court is a “state officer” does not satisfy his burden to establish Eleventh Amendment immunity.
In the absence of any evidence tying the Clerk’s Office to the state of South Carolina, we conclude that Gault has failed to demonstrate that the Eleventh Amendment immunizes him from Lawson’s monetary damages claim.
F.
We next consider the Pickering issue that Lawson has raised. Simply put, the history of this case does not present us with an adequate Pickering record to review. Gault moved for summary judgment based on Elrod-Branti, the district court granted the motion based on Elrod-Branti, Gault urged us to affirm the order based solely on Elrod-Branti, and we now hold that Gault failed to establish the Elrod-Branti defense. This resolves the appeal, and we need not go any further. Although we can affirm on any basis apparent from the record, we conclude that we cannot resolve the Pickering question on this record.
To provide context, we begin with an overview of the Pickering balancing test. As we explained in Smith v. Gilchrist, “the government, as an employer, ‘is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies,’ ” and therefore has “an interest in regulating the speech of its employees.” 749 F.3d 302, 308 (4th Cir. 2014) (quoting McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)). When these interests conflict with the free speech rights of public employees, Pickering tells us “to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an *252 employer, in promoting the efficiency of the public services it performs through its employees.” 391 U.S. at 568, 88 S.Ct. 1731.
In this balancing test, “the government bears the ‘burden of justifying the discharge on legitimate grounds.’ ” Gilchrist, 749 F.3d at 309 (quoting Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).[5] However, the government need not “prove that the employee’s speech actually disrupted efficiency”; rather, its burden is to show that “an adverse effect was ‘reasonably to be apprehended.’ ” Id. (quoting Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992)); see also Jurgensen v. Fairfax Cty., 745 F.2d 868, 879 (4th Cir. 1984) (“In the application of this test, ... it is not necessary for the agency to prove that morale and efficiency in the agency have actually been adversely affected by the publication; it is sufficient that such damage to morale and efficiency is reasonably to be apprehended.”).
To assess the government’s interest, we must consider the context of the employee’s speech. Rankin, 483 U.S. at 388, 107 S.Ct. 2891 (“In performing the balancing, the [employee’s] statement will not be considered in a vacuum; the manner, time, and place of the employee’s expression are relevant, as is the context in which the dispute arose.”). In Ridpath v. Board of Governors Marshall University, we listed nine non-exhaustive factors that the Supreme Court has considered significant:
[Wjhether a public employee’s speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee’s duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee’s role entailed.
447 F.3d 292, 317 (4th Cir. 2006) (citing McVey, 157 F.3d at 278). As the sheer number of Ridpath factors demonstrates, this inquiry is fact-intensive and context-specific, and will depend on the arguments the government develops and the evidence it offers.
Turning to the case at hand, we conclude that Gault has not developed a Pickering argument for us to analyze. When Gault moved for summary judgment, he did not raise Pickering as a basis for the motion. Even after Lawson raised Pickering in her- opposition brief,[6] Gault dismissed Pickering and urged the district court to decide the case based on Elrod-Branti. See J.A. 220. Gault argued that it made no difference whether the court analyzed the complaint as a free speech claim, or a claim of retaliation for disloyal candidacy, because Elrod-Branti governed both theories. See J.A. 225 (“[B]ecause, under South Carolina law, Plaintiff was regarded as the alter ego of Mr. Gault, he could terminate her for political disloyalty and/or ‘for speech displaying that political disloyalty.’ ” (quoting Bland, 730 F.3d at 394)).
*253 It is unsurprising, then, that the district court resolved the case on Elrod-Branti grounds. The district court’s opinion decided the motion based on its view of Lawson’s position as a “confidential, policymak-ing” employee, a consideration rooted in the Elrod-Branti doctrine. In doing so, the decision tracked the grounds under which Gault moved, because those were the only arguments the motion required the court to resolve.[7]
This pattern continued on appeal. Before us, Gault defended the district court’s order exclusively on Elrod-Branti grounds. Gault’s brief makes only a passing reference to Pickering, in which he declined to adopt the application of Pickering to this case:
Lawson insists that the fact that her First Amendment claim rests not merely on her candidacy but also on her speaking out in support of her candidacy somehow gives added heft to her First Amendment claim that must and can be overcome only by Gault’s making an evi-dentiary showing, under a Pickering-Connick balancing of interests, that her campaign speech actually disrupted the efficient operation of the clerk’s office. ... She is mistaken.
Appellee’s Br. at 30-31. Further, Gault’s substantive analysis of the balancing test consists of no more than one sentence. See Appellee’s Br. at 30-31. Without additional development, this is too slender a reed on which to base an analysis as fact-specific as Pickering requires.
For example, it is unclear whether Gault means to argue that Lawson’s specific comments about June Miller threatened office efficiency, or whether Lawson’s failed campaign alone was a source of office disruption. We do not mean to say that Gault has failed to justify his actions under Pickering. As we discuss below, the limited record before us indicates that Gault may have colorable Pickering arguments. We simply hold that we cannot resolve the issue based on what the parties have presented to us.[8]
G.
We turn now to the dissent’s contention that Lawson is entitled to summary judgment. This assertion is unusual to say the least, because, as we have noted, Lawson never moved for summary judgment. We should certainly exercise caution before granting a party relief she did not seek. And neither party has asserted Pickering as the ground for a motion, which hinders a meaningful Pickering analysis, and makes it premature to evaluate the issue in the context of this appeal. Additionally, we disagree that there is no evidence that Lawson’s conduct interfered with the operations of the Clerk’s Office. In view of the Ridpath factors, as we discuss below, we cannot conclude that Pickering compels a judgment in Lawson’s favor at this stage of the case, because the record indicates that Gault may have colorable Pickering arguments.[9]
In the course of her campaign, Lawson made a variety of statements about the Clerk’s Office and her colleague, June Miller. Some of her comments questioned *254 “where the funds were coming from to pay Ms. Miller,” in light of the previous embezzlement scandal. J.A. 186. Lawson also stated that “June Miller should not be in the clerk of court’s office,” that the “county council doesn’t want June Miller there,” and “June Miller is already drawing her social security and retirement.” J.A. 88.
As we consider the Ridpath factors, we first note that Lawson held a supervisory position, and therefore her statements would have a heightened effect within the office. In particular, Lawson’s negative public comments about an identified coworker could affect Lawson’s ability to maintain discipline in her division. In fact, the record reflects that Gault expressed concern about this, and noted that he expected that other co-workers would have difficulty working with Lawson going forward. J.A. 92.
For similar reasons, Lawson’s comments might have been expected to impair harmony among co-workers and damage close personal relationships. It is of particular significance in this regard that the Clerk’s Office consisted of only ten employees. And Gault does assert — in the only sentence of his appellate brief to address Pickering — that the potential for Lawson’s public comments to sow discord in his office was a serious concern. See Appel-lee’s Br. at 31.
Ridpath also counsels us to consider whether Lawson’s statements would have interfered with the operation and mission of the Clerk’s Office. Given Lawson’s public-facing role, Gault might argue that her statements would have had this effect. As the Supreme Court Clerk Manual recognizes, the Clerk and, statutorily, the Clerk’s deputy, are the public faces of the Office. See Clerk of Court Manual § 1.21 “Public Relations,” http://www.judicial. state.sc.us/ClerkOfCourtManual/display chapter.cfm?chapter=l#1.21. In publicly questioning Miller’s presence in the Office and the provenance of the funds used to compensate her, Lawson’s comments could have undermined the public’s confidence in the Office’s integrity and thereby compromised the Office’s performance. As we have noted, maintaining the public’s trust is especially important to the operations of the Family Court/Child Support Division, which Lawson oversaw.
Of all of the factors set out in Ridpath, the question of whether the speech was communicated to the public or to co-workers in private is arguably the most significant here. Lawson’s comments publicly associated a colleague, by name, with accounting irregularities with respect to the very account that the two were responsible for jointly overseeing in the Clerk’s Office.[10] Gault explained at his deposition that after Lawson made these comments, he “couldn’t very well bring [her] back in and expect her to sit beside June Miller.” J.A. 92. Although Lawson and Miller did not literally work side-by-side, it is undis *255 puted that they did work together to jointly manage the account in question and would need to continue to do so if Lawson were to return as deputy. And the fact that Gault and Lawson maintained a cordial relationship has no bearing on how Lawson’s comments would have affected Miller, or the Office as a whole.
Our recent decision in Gilchrist provides useful guidance here. In Gilchrist, we considered a First Amendment challenge brought by an assistant district attorney (“ADA”) who was terminated for making certain public comments while campaigning for Mecklenburg County district court judge. 749 F.3d at 304-05. During the campaign, the ADA gave an interview where he spoke out against a defensive-driving course run by a nonprofit organization independent of the DA’s office and unrelated to the ADA’s individual responsibilities. Id. at 305 n. 1. The program allowed those convicted of traffic violations to receive more lenient punishments, and “substantially reduced the number of cases that the DA’s office and the -courts were required to handle.” Id. at 305. Evaluating these facts under Pickering, we held that the defendant failed to justify the ADA’s termination. Id. at 309, 313.
Importantly, in Gilchrist, we relied on facts that were markedly different from those here. In that case, it was central to our decision that “none of the concerns Smith expressed in the interview had to do with Mecklenburg County District Attorney Office policy or in any way impugned the authority or credibility of the DA’s office.” Id. at 309-10 (footnote and internal quotation marks omitted). For the same reason that the ADA’s commentary did not “pertain[] to circumstances within [the DA’s] control,” there was also no basis for concluding that the ADA’s public statements would create “problems with harmony or discipline in the DA’s office such that the efficiency of the office would be expected to be adversely affected.” Id. at 310. Here, the facts are the very converse of those we relied on in Gilchrist: Lawson’s speech targeted her own office and her own colleague, whereas the ADA’s statements in Gilchrist did not.
The dissent accepts Lawson’s argument that Gault failed to adduce evidence of any actual disruption within the Clerk’s Office. This argument fails for several reasons. First, it misperceives both the procedural history of this case and the nature of Gault’s burden. As we have already discussed, the absence of developed Pickering arguments is unsurprising, given that Gault never moved for summary judgment based on Pickering, and had no reason to develop this theory. It would be unfair to fault him for not doing so. For example, the dissent points to the absence of testimony in the record from other Clerk’s Office employees. We cannot know whether other employees were deposed, or. whether Gault would wish to depose them to explore this issue. If anything; that is a reason to remand the case for further proceedings, and not a basis for entering judgment for Lawson.
Moreover, our precedent does not require an employer to proffer evidence that the employee’s speech caused disharmony or ill feeling. In Maciariello v. Sumner, we examined a First Amendment claim brought by two officers who conducted an unauthorized investigation of their captain. 973 F.2d at 297, 300. We credited the police chiefs interest in departmental morale, stressing that it was unnecessary to determine “[w]hether there was any concrete evidence that morale was disrupted” because “the potential for disruption [was] self-evident.” Id. at 300; see also Gilchrist, 749 F.3d at 309 (emphasizing that, under Maciariello, a public employer *256 need only show that an adverse effect was “reasonably to be apprehended”).
Finally, it would be a mistake to analyze Gault’s interests based on the morale in the Clerk’s Office at the time Lawson was fired, because the Pickering balance is necessarily forward-thinking, looking to anticipated harms. All that our precedent requires is that an employer reasonably anticipate a future disruption. See Jurgensen, 745 F.2d at 882 n. 21 (“[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.” (quoting Connick, 461 U.S. at 152, 103 S.Ct. 1684)).
In sum, based on the current record, Gault could certainly develop arguments that Lawson’s speech interfered with the operations of the Clerk’s Office. Therefore, we do not think it is appropriate for us to direct summary judgment for Lawson.
The dissent proposes that we not only reach an undeveloped issue that was not the subject of Gault’s motion, but that we take a leap further and grant summary judgment to a party who neither moved for summary judgment nor requested that relief on appeal.[11] We cannot agree with this proposal. Instead, we have confined our decision today to the narrow question before us: whether Gault’s motion for summary judgment had merit. Having concluded that it did not, we vacate the order granting the motion and return the case to the district court. If Gault chooses to pursue a Pickering defense on remand, the merits of his arguments will be for the district court, in the first instance, to resolve.
III.
For the foregoing reasons, the judgment of the district court is vacated and remanded. We leave to the sound discretion of the district court the decision whether to permit additional discovery, allow additional motions for summary judgment, or calendar the case for trial.
VACATED AND REMANDED

. The Judicial Council is a committee of judges, executive and legislative officials, and private individuals that make findings and recommendations on "the administration of justice” in South Carolina courts. See S.C. Code Ann. §§ 14-27-10 (creation), 14-27-20 (composition), 14-27-70 (duties).

. Because of a 2012 South Carolina Supreme Court decision unrelated to the present case, Lawson was ineligible to run in the Democratic primary. She ultimately ran as a Petition candidate in the general election.

. We are, of course, limited in our analysis to the evidence before us on appeal. For this reason, we make no broad proclamations about the roles of deputy clerks generally, for there may well be attributes of those positions — or Lawson’s specific position — of which we are not aware.

. The state does, however, provide "an annual salary supplement” to the Clerk of Court. J.A. 198.

. The balancing test is the second of the three elements of a First Amendment retaliation claim. McVey, 157 F.3d at 277-78. The other two elements (speech on a matter of public concern and causation) are not at issue here.

. This was a curious choice, because Lawson could have refuted the motion by insisting that the Elrod-Branti exception did not apply. Instead, she took on the task of defending her lawsuit under two different doctrines. Importantly, however, she chose not to move for summary judgment.

. Because Gault did not assert Pickering arguments in his motion, it certainly was'not error for the district court to decline to analyze that doctrine.

. For the same reason, we decline to decide whether Gault would be entitled to qualified immunity under a Pickering theory.

.To be clear, we do not reach the merits of this issue, and the discussion that follows is only intended to illustrate why Lawson’s entitlement to summary judgment, as the dissent proposes, is far from obvious.

. Lawson’s own affidavit acknowledges that her statement drew a connection between Miller and alleged accounting irregularities:
My concerns were where the funds were coming from to pay Ms. Miller who was there to help clean up the damage caused by the former Clerk of Court’s embezzlement scandal. ... After having gone through the Morris scandal and being investigated by SLED, I had a heightened sense of alertness, especially when it involved funds of the Clerk’s Office. J.A. 186-87. From the perspective of the Clerk’s Office staff, there could be no benign reason for Lawson to mention Miller by name in connection with these suspicions. Whether Lawson meant to suggest that Miller might have been embezzling funds, or whether she merely thought Miller was being paid with embezzled funds, the statement clearly associated Miller with suspicious accounting.

. We note that neither of the cases cited by the dissent — Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp., 216 F.3d 388, 398 (4th Cir. 2000), and U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n, 873 F.2d 731, 735-36 (4th Cir. 1989) — expressly held that a court of appeals may direct summary judgment to a non-moving party without giving notice to the parties. We need not opine on our authority to enter summary judgment for Lawson without first giving notice to Gault, because, as we have explained, the circumstances of this appeal counsel against directing such an order.