**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 17-2198

MARK F. MCCAFFREY,

                 Plaintiff - Appellant,

      v.

MICHAEL L. CHAPMAN, in his personal capacity and in his official capacity as Sheriff of Loudoun County; BOARD OF SUPERVISORS OF LOUDOUN COUNTY, VIRGINIA, in their official capacities; LOUDOUN COUNTY, VIRGINIA,

                 Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:17-cv-00937-AJT-IDD)

Argued: October 30, 2018                           Decided: April 9, 2019

Before WILKINSON, KING, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson joined. Judge King wrote a dissenting opinion.

**ARGUED:** Robert John Cynkar, MCSWEENEY, CYNKAR & KACHOUROFF PLLC, Woodbridge, Virginia, for Appellant. Alexander Francuzenko, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellees. **ON BRIEF:** Patrick M. McSweeney, Powhatan, Virginia, Christopher I. Kachouroff, MCSWEENEY, CYNKAR & KACHOUROFF PLLC, Woodbridge, Virginia, for Appellant. Courtney Renee,

OFFICE OF LOUDOUN COUNTY ATTORNEY, Leesburg, Virginia, for Appellees Board of Supervisors of Loudoun County, Virginia and Loudoun County, Virginia.

———————————

QUATTLEBAUM, Circuit Judge:

This case arises from Sheriff Michael L. Chapman's decision not to re-appoint Mark F. McCaffrey as a deputy sheriff in Loudoun County, Virginia. In response, McCaffrey sued Sheriff Chapman, the Board of Supervisors of Loudoun County and Loudoun County (collectively "Appellees"). McCaffrey alleges that Sheriff Chapman did not re-appoint him because he supported Sheriff Chapman's political opponent during the re-election campaign. McCaffrey claims that Sheriff Chapman's failure to re-appoint him for his political disloyalty violated his First Amendment rights to freedom of political association and speech. The district court found that the *Elrod-Branti* doctrine, which permits public officials to fire certain employees for their support of a political opponent, precludes McCaffrey's First Amendment claims. Therefore, the district court dismissed McCaffrey's complaint. For the reasons that follow, we affirm.

I.

A.

A sheriff has the power, under Virginia law, to appoint deputy sheriffs.[1] Appointments of deputy sheriffs technically expire at the end of a sheriff's four-year

---

[1] The history of the office of sheriff runs deep in the state of Virginia. According to the National Sheriffs' Association, the first sheriff in America was Captain William Stone who, in 1634, was appointed sheriff for the Shire of Northampton in the colony of Virginia. Sheriff Roger Scott, *Roots: A Historical Perspective of the Office of Sheriff*, NATIONAL SHERIFFS' ASSOCIATION, https://www.sheriffs.org/publications-resources/resources/office-of-sheriff (saved as ECF opinion attachment).

term, even if the sheriff is re-elected. In practice, deputy sheriffs are routinely re-appointed after each election.

McCaffrey started working in the Loudoun County Sheriff's Office ("LCSO") in 2005.[2] In 2008, he began working as a major crimes detective serving as a lead detective in complex, high-profile cases. McCaffrey supported Sheriff Chapman when he first ran for sheriff in 2011. However, when Sheriff Chapman ran for re-election in 2015, McCaffrey supported his opponent.

McCaffrey placed a sign in his yard in support of Sheriff Chapman's opponent and served as a delegate to the Republican convention in which the Republican candidate for sheriff was chosen. McCaffrey also participated as an outside advisor in the screening of local candidates for potential endorsement by the Board of Directors of the local chapter of the Virginia Police Benevolent Association. McCaffrey did not speak publicly about the election. He did not wear campaign apparel or accessories. He did not use his LCSO position in support of Sheriff Chapman's opponent.

Sheriff Chapman viewed McCaffrey's support of his opponent as disloyal. McCaffrey's colleagues warned McCaffrey that there would be consequences for his disloyalty.

After Sheriff Chapman won re-election, McCaffrey received a letter informing him that his appointment as a deputy sheriff would not be renewed. In addition to not

---

[2] The facts described are taken from the complaint since we review the district court's order granting a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

reappointing McCaffrey, Sheriff Chapman lowered McCaffrey's score on his final performance evaluation to prevent McCaffrey from receiving a bonus. Sheriff Chapman also interfered with McCaffrey's opportunity to be considered for a law enforcement position sponsored by the LCSO and a nearby municipal police department.

B.

In response to Sheriff Chapman's actions, McCaffrey filed a complaint against Appellees in Virginia state court. McCaffrey alleged that Sheriff Chapman's decision not to re-appoint him violated his First Amendment rights to freedom of political association and speech under both the United States and the Virginia Constitution. Appellees removed the case to federal court based on federal question jurisdiction.

Appellees then moved to dismiss McCaffrey's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Appellees asserted that Sheriff Chapman's decision not to re-appoint McCaffrey fell squarely within an exception to the First Amendment known as the *Elrod-Branti* exception. As described more fully below, the *Elrod-Branti* exception, when applicable, allows public officials to terminate public employees for supporting a political opponent.

After oral argument, the district court found that the *Elrod-Branti* exception applied and dismissed McCaffrey's complaint.[3] McCaffrey appealed the order of the dismissal. We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

---

[3] Since the district court found that Appellees did not infringe McCaffrey's First Amendment rights, it did not need to consider whether McCaffrey adequately pled (Continued)

5

II.

A.

This Court reviews a district court's grant of a motion to dismiss de novo. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). In exercising this de novo review, we follow the well-settled standard for evaluating a motion to dismiss.

A plaintiff's complaint must set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). But a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

In considering a motion to dismiss under Rule 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff. . . ." *Nemet*, 591 F.3d at 255. However, a court should grant a Rule 12(b)(6) motion if, "after

municipal liability for his 42 U.S.C. § 1983 claims against the Board of Supervisors of Loudoun County, Virginia and Loudoun County, Virginia.

McCaffrey also filed a partial motion for summary judgment claiming, as a matter of law, Appellees' conduct violated the First Amendment. The district court denied this motion upon granting Appellees' motion to dismiss.

accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

B.

On appeal, McCaffrey alleges that the district court erred by dismissing his First Amendment claims. McCaffrey's appeal implicates two doctrines that provide exceptions to the First Amendment's protections.

The first doctrine is known as the *Elrod-Branti* exception. Generally, the First Amendment's right to freedom of political association prohibits government officials from terminating public employees solely for supporting political opponents. However, under the *Elrod-Branti* exception, certain public employees can be be terminated for political association in order to give effect to the democratic process. *See Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976).

The second doctrine is known as the *Pickering-Connick* doctrine. The First Amendment's right to freedom of speech generally prohibits dismissals of employees in retaliation for the exercise of protected speech. However, under the *Pickering-Connick* doctrine, the First Amendment does not protect public employees from termination when their free speech interests are outweighed by the government's interest in providing efficient and effective services to the public. *See Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968).

7

As noted above, the district court dismissed McCaffrey's complaint finding that Chapman's decision to not re-appoint McCaffrey did not violate the First Amendment because it fell within the *Elrod-Branti* exception. The district court did not address the *Pickering-Connick* doctrine. We address these doctrines in turn.

C.

Turning to the *Elrod-Branti* exception, we first review the case law that establishes and interprets the exception. Then, we consider whether Sheriff Chapman's dismissal of McCaffrey for supporting his political rival fell within the exception. Last, we address McCaffrey's specific challenges to the district court's findings regarding the exception.

1.

The *Elrod-Branti* exception to the First Amendment's protection against political affiliation dismissals was created from two Supreme Court cases. In *Elrod*, a plurality of the Supreme Court established the general rule that dismissing public employees for political affiliation violates their First and Fourteenth Amendment rights by limiting their political belief and association. However, the Supreme Court simultaneously carved out a narrow exception to this general rule prohibiting patronage dismissals. A government official does not violate a public employee's First Amendment rights when the employee is dismissed for political association if the employee holds a policymaking position. *Elrod*, 427 U.S. at 367. In creating this exception, the Supreme Court recognized the dangers of the government's interests being "undercut by tactics obstructing the

8

implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id*.

In *Branti*, the Supreme Court clarified the exception announced in *Elrod*. The Court explained that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. The Court reasoned that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Id*. at 517.

Interpreting *Elrod* and *Branti*, this Court established a two-step inquiry for determining when party affiliation is an appropriate job requirement. *Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990). First, a court must examine whether the position at issue relates to partisan political interests. *Id*. at 141. If the "first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles . . . [an] office holder whose function is such that party affiliation is an equally appropriate requirement." *Id*. at 142 (citing *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir. 1986)).

On several occasions, this Court has applied the *Elrod-Branti* exception in the context of a sheriff dismissing a deputy for supporting the sheriff's opponent. Most notably, in *Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997), this Court, sitting en banc, held that under the *Elrod-Branti* exception a North Carolina sheriff could terminate

9

his deputy sheriffs for political affiliation. In determining that political affiliation was an appropriate job requirement, this Court first recognized that the electorate generally chooses a candidate based on policies and goals espoused by that candidate. *Id*. at 1162. Thus, a sheriff owes a duty to the electorate to ensure that those policies are implemented. *Id*.

This Court also found that deputy sheriffs play a special role in implementing the sheriff's policies and goals. *Id*. Deputy sheriffs on patrol exercise significant discretion and make decisions that create policy. *Id*. The sheriff relies on his deputies "to foster public confidence in law enforcement" and "to provide the sheriff with the truthful and accurate information he needs to do his job." *Id*.

Next, this Court examined the specific roles of sheriffs and deputies under North Carolina law. *Id*. at 1163. The North Carolina legislature has declared that the offices of sheriff and deputy sheriff are of special concern and prescribed a mandatory procedure for filling a sheriff vacancy. *Id*. Under North Carolina law, the sheriff may not delegate his duties but is able to appoint deputies to assist him. *Id*. For those appointed deputies, the sheriff is liable for their misbehavior. *Id*. Because a sheriff is liable for his deputies' actions, the legislature created deputies as at-will employees "who 'shall serve at the pleasure of the appointing officer.'" *Id*. at 1164 (quoting N.C. Gen. Stat. § 153A–103(2) (1996)).

After examining the role of deputy sheriffs, this Court determined that a deputy sheriff could appropriately be terminated for political affiliation under the *Elrod-Branti* exception.

We hold that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity. Either basis serves as a proxy for loyalty to the sheriff.

We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign for the candidate's opponent. . . . "It was never contemplated that … sheriffs … must perform the powers and duties vested in them through deputies or assistants selected by someone else," and we do not believe it was ever contemplated that a sheriff must implement his policies and perform his duties through deputies who have expressed clear opposition to him.

*Id*. at 1164–65 (footnotes omitted).

This Court then explained that our holding was not based simply on a deputy sheriff's title. Instead courts look to the actual duties of the position of deputy sheriff. Specifically, we held:

We limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed. Because the deputies in the instant case were law enforcement officers, they are not protected by this limitation.

*Id*. at 1165 (footnotes omitted).[4]

Subsequently, in *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013), this Court applied *Jenkins* and held that the exception did not apply when a deputy sheriff merely holds the title of deputy without engaging in law enforcement activities. In *Bland*, three

---

[4] It is clear our good colleague disapproves of *Jenkins*. He says so directly in the first paragraph of his dissent and then attempts to explain away its plain language. However, in relying on *Jenkins*, we are merely following the precedent of this Court, as we must.

of the plaintiffs were uniformed jailers with the title of deputy sheriff. *Id.* at 377. They were terminated for supporting the sheriff's electoral opponent. *Id.* at 371. This Court held that the *Elrod-Branti* exception to the First Amendment did not apply to them because the deputies in *Bland* had very different duties from the deputies in *Jenkins*. In *Bland*, the jailers' authority was more circumscribed, and their training was more concentrated on matters of custodial care and supervision than the deputy sheriffs in *Jenkins*. Additionally, the jailers in *Bland* did not have arrest power, did not take the core law enforcement course and were not out in the county engaging in law enforcement activities on behalf of the sheriff. *Id.* at 379.[5]

Likewise, in *Knight v. Vernon*, this Court held that political allegiance to an employer was not an appropriate job requirement for a low-level jailer position. 214 F.3d 544 (4th Cir. 2000). This Court found that a jailer's duties were "essentially custodial." *Id.* at 551. As a result, this Court held that the *Elrod-Branti* exception did not apply.

---

[5] *Bland* clarifies that *Jenkins* was not "cabined" to North Carolina sheriffs and deputy sheriffs as the dissent suggests. *Bland* applied *Jenkins* to deputy sheriffs in Virginia, like we have in this case. Although *Bland* concluded the *Elrod-Branti* exception did not apply in that case, its conclusion was based on the duties of those deputy sheriffs. In *Bland*, the deputy sheriffs' duties were those of uniformed jailers rather than sworn law enforcement officers. *Bland*'s conclusion was not based on any differences in the law of North Carolina and Virginia concerning sheriffs and deputy sheriffs. If *Jenkins* was "cabined" as the dissent suggests, *Bland* would have so indicated and decided the case accordingly. Instead, *Bland* noted that the dispositive issue in *Jenkins* was "the deputies' role as sworn law enforcement officers" and that *Jenkins* indicated its "result might have been different had the deputies' duties consisted of working as dispatchers." *Bland*, 730 F.3d at 377. McCaffrey's duties were those of a sworn law enforcement officer, not duties like those of a dispatcher. Accordingly, *Bland* supports, not conflicts, with our conclusion.

Our precedent, when considered together, provides the framework for our *Elrod-Branti* analysis. We first look to the electorate's approval of the policies on which the sheriff ran and the duties and responsibilities of the deputy sheriff in implementing those policies and priorities. We then examine the law of Virginia concerning the relationship between sheriffs and their deputies.

2.

Using this framework, we now turn to the facts of this case. Sheriff Chapman won an election for sheriff after espousing positions on how the LCSO should be run. As we have said before, "[e]lections mean something. Majorities bestow mandates." *Borzilleri v. Mosby*, 874 F.3d 187, 192 (4th Cir. 2017). Thus, Sheriff Chapman should be entitled, and indeed *Jenkins* provides that he has a duty, to carry out the policies the voters approved in the election.

Next, the allegations in McCaffrey's complaint indicate his duties and responsibilities involved carrying out Sheriff's Chapman's policies and priorities. McCaffrey was a sworn deputy sheriff. He was a lead investigator of high-profile crimes including rape, robbery and homicide investigations. McCaffrey received the Loudoun County Investigator of the Month Award three times and was part of the "Team of the Month" three times. In 2015, McCaffrey was recognized for closing violent crime cases at a rate that significantly exceeded the national average. McCaffrey also received the Victim Services award from the Loudoun County Commonwealth Attorney's office. Like the deputy sheriffs in *Jenkins* and unlike the deputies in *Bland* and *Knight*, McCaffrey engaged in law enforcement functions on behalf of the sheriff. Under our precedent, a

13

deputy sheriff with these duties and responsibilities falls within the *Elrod-Branti* exception.

As this Court has made clear, a sworn deputy sheriff like McCaffrey had a special role in carrying out the law enforcement policies, goals and priorities on which Sheriff Chapman campaigned and prevailed. *Jenkins,* 119 F.3d 1162. Sheriff Chapman was entitled to carry out the policies on which he ran and won with deputy sheriffs who did not oppose his re-election. To repeat what this Court said in *Jenkins*, "we do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him." *Id.* at 1165.

McCaffrey's complaint illustrates the rationale behind the *Elrod-Branti* exception. An entire section of the complaint reads as a political attack ad against Sheriff Chapman. McCaffrey attacks Sheriff Chapman's character by accusing him of questionable fund raising, expenditures and hiring practices. McCaffrey alleges that Sheriff Chapman's treatment of employees was abusive and malicious and that Sheriff Chapman acted unprofessionally. McCaffrey also accuses Sheriff Chapman of mismanagement in the operations of the LCSO. Requiring a sheriff to employ deputies who have displayed the level of hostility portrayed in this complaint could reasonably impede a sheriff's obligation to his electorate to implement the platform on which he campaigned.

This does not mean that law enforcement responsibilities are or should be handled in a political manner. That, of course, should never be the case. Instead, our decision is based on the reality, recognized in *Jenkins*, that sheriffs do and should carry out the policies, goals and priorities on which they ran. *Id.* at 1162. Sheriffs, by virtue of their

14

executive roles, do not set policy in the same way as those performing legislative roles. But, in attempting to faithfully enforce the law, they must make policy-oriented decisions about the allocation of manpower and financial resources. A deputy sheriff necessarily carries out the sheriff's policies, goals and priorities which were approved by the electorate in a political election. *Id*. at 1162–63.

Virginia law concerning the roles of sheriffs and their deputies confirms that deputies performing law enforcement functions have a policymaking role. Virginia's legislature passed laws specific to the role of the sheriff as a constitutional, elected officer. *See* Va. Code §§ 15.2-1609–15.2-1625 (1997). Virginia law prescribes a mandatory procedure for filling a vacancy in the sheriff's office. *See* Va. Code § 15.2-1600. Virginia law also specifies that sheriffs may appoint deputies to "discharge any of the official duties of their principal during his continuance in office…." Va. Code § 15.2-1603. It further mandates that deputies "before entering upon the duties of his office, shall take and prescribe the oath. . . ." *Id*. Virginia law also provides that "any such deputy may be removed from office by his principal." *Id*. Additionally, a sheriff in Virginia is civilly and criminally liable for the acts of his deputy. *See Whited v. Fields*, 581 F. Supp. 1444, 1455 (W.D. Va. 1984) (finding that "not only is the sheriff liable civilly for the acts of his deputy in Virginia, but he also is liable criminally and can be fined for the conduct of his deputy"). Similar to North Carolina law discussed in *Jenkins*,

15

the law of Virginia supports the conclusion that a sworn deputy sheriff is the type of employee to whom the *Elrod-Branti* exception applies.[6]

3.

Before concluding our *Elrod-Branti* analysis, we address McCaffrey's argument that the complaint, at a minimum, states a plausible claim for relief. Specifically, McCaffrey alleges in the complaint that he was not a policymaker for the LCSO, was not a spokesman for the LCSO, and did not represent the sheriff or speak on his behalf. McCaffrey further alleges that he was far down the chain of command under Sheriff Chapman's para-military structure that governed the LCSO's 600 deputy sheriff force.

Since we are reviewing an order granting a Rule 12(b)(6) motion, we accept these allegations as true. However, these allegations do not save the complaint. In determining whether the deputy sheriff's duties and responsibilities fall within the *Elrod-Branti* exception, *Jenkins* instructs that we look to whether McCaffrey was a deputy sheriff "actually sworn to engage in law enforcement activities on behalf of the sheriff." *Jenkins*, 119 F.3d at 1166. Here, the allegations of the complaint leave no doubt that he was a

_____

[6] The dissent emphasizes that *Jenkins* hinged on this Court's finding that in North Carolina, deputy sheriffs are alter egos of sheriffs. The comparison of North Carolina and Virginia law herein illustrates the laws of the two states on this point are substantially similar. However, Virginia case law is even more clear. In Virginia, "the relationship between the sheriff and his deputy is such that he is not simply the 'alter ego' of the sheriff, but he is one and the same as the sheriff." *Whited*, 581 F. Supp. at 1454 (citing *Mosby's Adm'r v. Mosby's Adm'r*, 50 Va. (9 Gratt.) 584, 602–05 (1853)). *See also Bd. of Sup'rs of Rockingham Cty. v. Lucas*, 128 S.E. 574, 576 (Va. 1925) (finding that "[i]n contemplation of [Virginia] law, both organic and statutory, a sheriff and a deputy sheriff are one."). Thus, to the extent it is necessary for a deputy sheriff to be the alter ego of the sheriff to fall within *Jenkins*, that is clearly the case under Virginia law.

16

deputy sheriff engaged in law enforcement activities and was not performing "custodial" duties like the deputies in *Bland* and *Knight*. Therefore, even accepting the allegations to which McCaffrey points as true, the *Elrod-Branti* exception applies to McCaffrey and the allegations of the complaint do not assert a plausible claim.

McCaffrey also argues that his allegations about Sheriff Chapman's post-termination downward adjustment of McCaffrey's evaluation scores and interference with McCaffrey's efforts to obtain other employment removes this case from our precedent. However, those allegations are not material to the *Elrod-Branti* analysis. Such conduct might support a state law claim such as interference with prospective contractual relationship or other similar theories. But we must look to the nature of the deputy sheriff's duties, not the way in which he was terminated. Therefore, the post-termination allegations are of no import here. Even accepting these post-termination allegations as true, we find that the *Elrod-Branti* exception applies and McCaffrey has failed to state a claim that his First Amendment rights were violated. [7]

D.

Last, we turn to the *Pickering-Connick* doctrine. McCaffrey argues that his complaint states a claim of unconstitutional retaliation in response to McCaffrey's

---

[7] While we must faithfully apply the appropriate standard for considering a Rule 12(b)(6) motion, this Court has previously decided *Elrod-Branti* decisions at the pleading stage. For example, in *Jenkins,* this Court reversed the district court's denial of the sheriff's motion to dismiss and remanded the case to the district court to enter an order of dismissal. *Jenkins,* 119 F.3d at 1165. Further, in *Borzilleri*, we recently reviewed a district judge's grant of a motion to dismiss and found that the *Elrod-Branti* exception applied. 874 F.3d at 189.

17

exercise of his free speech rights under *Pickering*-*Connick*. McCaffrey asserts that the district court erred by not addressing this issue and by dismissing the lawsuit. However, even when applied, the *Pickering*-*Connick* doctrine does not create a plausible claim for which relief can be granted.

The Supreme Court in *Pickering* recognized that a cause of action exists for government employees who suffered retaliation by an employer for the exercise of the right guaranteed by the First Amendment to speak as a citizen on a matter of public concern. *Pickering*, 391 U.S. at 574. *Pickering* established a balancing test where the government's interest in the efficiency of the public service it performs is weighed against the community's interest in hearing the employees' informed opinions on important public issues. *Borzilleri*, 874 F.3d at 193–194 (citing *Pickering,* 391 U.S. at 568).

There are two threshold issues that must be met to proceed to the balancing inquiry. *Id.* "First, we determine whether public employees' statements can 'be fairly characterized as constituting speech on a matter of public concern.'" *Id*. at 194 (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)). If so, then "we ask whether public employees were speaking 'pursuant to their official duties.'" *Id*. (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). We must answer the first question in the affirmative and the second in the negative to proceed to the balancing of interests. *Id*.

There is no dispute that the second threshold question can be answered in the negative. McCaffrey was not speaking pursuant to his official duties as a deputy sheriff. As for the first threshold question, there may be some question as to whether

18

McCaffrey's actions in supporting Sheriff Chapman's opponent can be characterized as "speech on a matter of public concern." *Connick*, 461 U.S. at 146. However, we decline to find that McCaffrey's actions were not such speech. Considering the action to be qualifying speech, the balancing inquiry nevertheless weighs in favor of Sheriff Chapman, and thus we need not determine whether McCaffery's actions were the type of speech protected in *Pickering*.

As stated by this Court in *Borzilleri*, "[o]nce we have found that the *Elrod-Branti* policymaker exception applies, the *Pickering* balance generally tips in favor of the government because of its overriding interest in ensuring an elected official's ability to implement his policies through his subordinates." *Id*. at 194. This Court in *Bland* similarly found that "in cases in which the *Elrod-Branti* exception applies, and an employer therefore does not violate his employee's association rights by terminating him for political disloyalty, the employer also does not violate his employee's free speech rights by terminating him for *speech* displaying that political disloyalty." 730 F. 3d at 394. We see no reason to depart from that conclusion here. We find that Sheriff Chapman had an overriding interest in ensuring his ability to implement his policies through his deputies. Therefore, the *Pickering-Connick* does not save McCaffrey's lawsuit from dismissal.

## III.

In conclusion, we hold that under the *Elrod-Branti* exception, Sheriff Chapman's decision not to re-appoint McCaffrey did not violate his First Amendment right to freedom of political association. We also hold that Sheriff Chapman's decision not to

19

reappoint McCaffrey did not violate his First Amendment right to freedom of speech under the *Pickering-Connick* doctrine because the balancing test weighs in favor of Sheriff Chapman. For the reasons given, the district court's ruling dismissing the case is

*AFFIRMED.*

KING, Circuit Judge, dissenting:

Two decades ago, in *Jenkins v. Medford*, our en banc majority concluded that the plaintiff North Carolina deputy sheriffs were the "alter ego" of the elected sheriff and thus could be terminated for political reasons under the *Elrod-Branti* exception. *See* 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc). The *Jenkins* dissenters protested — quite rightfully, in my view — that the majority "ma[de] the *Elrod-Branti* exception into the rule" and thereby "eviscerate[d] the First Amendment protections those cases guaranteed to government workers like the [plaintiffs]." *Id.* at 1169 (Motz, J., dissenting). At least, however, *Jenkins* must be read as predicated on specifics of North Carolina law and limited to North Carolina deputy sheriffs engaged in law enforcement activities. Unfortunately, that has not constrained my esteemed colleagues from ruling today — purportedly in reliance on *Jenkins* but actually going much farther — that any deputy sheriff tasked with law enforcement anywhere is subject to political firing. As explained further herein, I respectfully dissent.

I.

In demonstrating that my friends have gone too far, I begin with a discussion of the settled legal principles concerning the political firings of public employees and the considerations that undergird the *Elrod-Branti* exception, with emphasis on the controlling Supreme Court authority. I also outline this Court's two-prong test for conducting a proper *Elrod-Branti* analysis and then carefully examine our *Jenkins v. Medford* decision.

A.

The Supreme Court has underscored that, in most situations, adverse employment actions based on political considerations "impermissibly encroach on First Amendment freedoms." *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74 (1990). The Constitution's prohibition against political firings is thus the default rule. Politically motivated employment terminations, however, are permissible — under the *Elrod-Branti* exception — if those "practices are narrowly tailored to further vital government interests." *Id.*

In *Elrod v. Burns* in 1976, the Supreme Court recognized that the First Amendment protects public employees from being fired "solely for the reason that they were not affiliated with" a certain political party or candidate. *See* 427 U.S. 347, 350 (1976) (plurality opinion). According to the Court, conditioning the employment of a public servant on political loyalty "unquestionably inhibits protected belief and association," and terminations of public employees for a lack of political loyalty penalize the exercise of those protected rights. *Id.* at 359. Consistent with that principle, the Court concluded that the *Elrod* plaintiffs — one of whom was a chief deputy sheriff — had successfully alleged claims for violations of their First Amendment rights by specifying that they were fired by the sheriff because of their party affiliations. *Id.* at 350, 373. But the Court carved out the exception that, for certain policymaking positions, terminations based on political allegiance — and the corresponding restraint on those employees' freedoms of belief and association — are justified to safeguard our form of representative government. *Id.* at 367-68.

22

Just four years later, in *Branti v. Finkel*, the Court refined *Elrod*'s policymaker exception and clarified that political terminations are only permissible where "the hiring authority can demonstrate that [political loyalty] is an appropriate requirement for the effective performance of the public office involved." *See* 445 U.S. 507, 518 (1980). Accordingly, as the Court explained, the labels that may be applied to a public employee, such as "policymaker" or "confidential," are not dispositive of whether that employee may be fired because of political loyalty. *Id.*

Adhering to Supreme Court precedent, this Court and our sister courts of appeals have recognized that the *Elrod-Branti* exception is "narrow" and must always be applied with caution. *See Bland v. Roberts*, 730 F.3d 368, 374 (4th Cir. 2013) ("*Elrod* created a narrow exception . . . ."); *Stott v. Haworth*, 916 F.2d 134, 140 (4th Cir. 1990) (explaining that *Elrod* and *Branti* were "specific, narrow application[s] of" exception to principle against infringement of First Amendment rights (internal quotation marks omitted)); *see also Thompson v. Shock*, 852 F.3d 786, 793 (8th Cir. 2017) (describing application of "narrow *Elrod-Branti* justification test" (alteration and internal quotation marks omitted)); *Hunt v. Cnty. of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) ("[W]e have held that the [*Elrod-Branti*] exception is 'narrow' and should be applied with caution." (quoting *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000))); *Assaf v. Fields*, 178 F.3d 170, 177 (3d Cir. 1999) (giving guidance as to when a position will "meet the narrow *Branti-Elrod* exception").

Again, the *Elrod-Branti* exception must always be applied narrowly, to prevent the coercion of the beliefs and associations of public servants. *See O'Hare Truck Serv., Inc.*

23

*v. City of Northlake*, 518 U.S. 712, 718 (1996) ("*Elrod* and *Branti* establish that patronage does not justify the coercion of a person's political beliefs and associations."). At bottom, the *Elrod-Branti* exception is reserved for those exceptional and "high-level" government positions for which interference with the "employees' freedom to believe and associate" is justified by the effective implementation of government policy. *See Rutan*, 497 U.S. at 74-76.

B.

In *Stott v. Haworth* in 1990, our Judge Russell identified the two-prong test for conducting the *Elrod-Branti* analysis. *See* 916 F.2d at 141-43. The threshold inquiry is whether the position at issue implicates "partisan political interests or concerns." *Id.* at 141 (alterations and internal quotation marks omitted). Thus, pursuant to the first prong of the *Stott* test, we inspect whether "the position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Id.* (internal quotation marks omitted). If that question is answered in the affirmative, we turn to the *Stott* test's second prong, under which we "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that [political loyalty] is an equally appropriate requirement." *Id.* at 142 (internal quotation marks omitted).

Although the first *Stott* prong "requires us to examine the issues dealt with by the employee 'at a very high level of generality,'" the second prong "'requires a much more concrete analysis of the specific position at issue.'" *See Bland*, 730 F.3d at 375 (quoting

24

*Fields v. Prater*, 566 F.3d 381, 386 (4th Cir. 2009)). Significantly, the Supreme Court and our Court have consistently emphasized that we are obliged to examine the specific duties of a "particular position," not merely the general nature thereof. *See Branti*, 445 U.S. at 518 (explaining that the ultimate inquiry assesses whether politics is "an appropriate requirement for the effective performance of the public office involved"); *Stott*, 916 F.2d at 142 (describing dispositive inquiry as "particular responsibilities" "of the public office in question" (internal quotation marks omitted)).

C.

In *Jenkins v. Medford* in 1997, our en banc majority acknowledged the *Stott* test and ruled that the *Elrod-Branti* exception permitted the political firings of North Carolina deputy sheriffs engaged in law enforcement activities. *See Jenkins*, 119 F.3d at 1162-65. As broad as that holding was, we have recognized that *Jenkins* can be read even more broadly, to allow the political firings of any and all deputy sheriffs in North Carolina. *See id.* at 1166 (Motz, J., dissenting) (protesting that "the majority broadly holds that *all* deputy sheriffs in North Carolina — regardless of their actual duties — are policymaking officials"); *see also Bland*, 730 F.3d at 377 (confronting "a significant amount of language in [*Jenkins*] seemingly indicating that all North Carolina deputies could be terminated for political reasons regardless of the specific duties of the particular deputy in question"). In the face of the "very mixed signals" sent by *Jenkins*, however, we have resolved "that *Jenkins* is best read as analyzing the duties of the particular deputies before the court," i.e., North Carolina deputies tasked with law enforcement. *See Bland*, 730

25

F.3d at 391. Indeed, that is the only way to read *Jenkins* in a manner even arguably consistent with the controlling Supreme Court precedent.

Although it did not explicitly refer to the first *Stott* prong in doing so, the *Jenkins* majority began its *Elrod-Branti* analysis with what was apparently an inquiry into how the position of deputy sheriff relates to partisan political interests or concerns. *See Jenkins*, 119 F.3d at 1162-63. Invoking decisions of other courts of appeals, *Jenkins* determined that a sheriff's election by popular vote "indicates voter approval of [the sheriff's] espoused platform and general agreement with [his] expressed political agenda"; "[t]he sheriff owes a duty to the electorate and the public at large to ensure that his espoused policies are implemented"; and "[d]eputy sheriffs play a special role in implementing the sheriff's policies and goals." *Id.* at 1162 (internal quotation marks omitted). As examples of the "special role" that may be played by deputies in implementing the sheriff's policies and goals, *Jenkins* specified that deputies may be included in the sheriff's "core group of advisors," may "work autonomously" while "exercising significant discretion," and may "make some decisions that actually create policy." *Id.* (internal quotation marks omitted). *Jenkins* further noted that the sheriff may rely "on his deputies to foster public confidence in law enforcement" and expect them to provide "the truthful and accurate information he needs to do his job." *Id.* Finally, *Jenkins* observed that, "[i]n some jurisdictions, the deputy sheriff is the general agent of the sheriff, and the sheriff is civilly liable for the acts of his deputy." *Id.* at 1162-63.

26

The *Jenkins* majority only then turned, albeit without naming the second *Stott* prong, to the *Elrod-Branti* inquiry concerning the particular responsibilities of the plaintiff North Carolina deputy sheriffs. *See Jenkins*, 119 F.3d at 1163 ("[W]e now consider the specific political and social roles of sheriffs and their deputies in North Carolina."). That examination led to the following holding:

> [We] conclude that in North Carolina, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are *the alter ego of the sheriff generally*, for whose conduct he is liable. We therefore hold that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the *Elrod-Branti* exception to prohibited political terminations.

*Id.* at 1164 (emphasis added).

The North Carolina deputy sheriffs' role as "the alter ego of the sheriff generally" was plainly crucial to the *Jenkins* majority and an explicit part of its succinct holding. In designating North Carolina deputy sheriffs as the sheriff's alter ego, *Jenkins* relied on a combination of factors. Of obvious and exceptional importance, *Jenkins* highlighted that the North Carolina legislature had "recognized the special status of sheriffs' deputies in the eyes of the law." *See* 119 F.3d at 1163. Specifically, *Jenkins* pointed to the legislature's findings related to sheriffs and their deputies. As part of those findings, as quoted in *Jenkins*, the legislature related that "'[t]he deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff.'" *Id.* (quoting N.C. Gen. Stat. § 17E-1).

27

The *Jenkins* majority elaborated that, although "[t]he sheriff may not delegate final responsibility for his official duties, . . . he may appoint deputies to assist him [and] can be held liable for the misbehavior of the deputies." *See* 119 F.3d at 1163 (citing, inter alia, N.C. Gen. Stat. § 162-24). Additionally, *Jenkins* cited the North Carolina legislature's declaration "that '[t]he offices of sheriff and deputy sheriff are . . . of special concern to the public health, safety, welfare and morals of the people of the State,'" as well as the legislature's mandatory procedure for filling a vacancy in the office of sheriff by accepting the recommendation of the elected sheriff's political party. *Id.* (citing N.C. Gen. Stat. §§ 17E-1, 162-5.1). *Jenkins* also recognized that — presumably due to the special status of North Carolina deputy sheriffs — "the legislature has made deputies at-will employees, who 'shall serve at the pleasure of the appointing officer.'" *Id.* at 1163-64 (quoting N.C. Gen. Stat. § 153A-103(2)).

Notwithstanding the language indicating that all North Carolina deputy sheriffs are policymakers subject to political firings, the *Jenkins* majority eventually cabined its decision to those deputies whose particular functions rendered them "the alter ego of the sheriff generally," i.e., "those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." *See* 119 F.3d at 1165. Moreover, *Jenkins* is replete with language that limits its pronouncements to *North Carolina* deputies tasked with law enforcement. *See, e.g.*, *id.* at 1163 (turning to analysis of "specific political and social roles of sheriffs and their deputies *in North Carolina*" (emphasis added)); *id.* at 1164 (concluding that "*in North Carolina*, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is

28

liable" (emphasis added)); *id.* ( "hold[ing] that such *North Carolina* deputy sheriffs may be lawfully terminated for political reasons" (emphasis added)).

Although it did not explicitly peg its analysis to the two *Stott* prongs, the *Jenkins* majority also underscored the applicability of the *Stott* test and the need to examine the particular position at issue. *See Jenkins*, 119 F.3d at 1164 (instructing that "the district courts are to engage in a *Stott*-type analysis, examining the specific position at issue, as we have done here today"); *id.* at 1165 (explaining "that courts examine the job duties of the position, and not merely the title, of those dismissed").

After announcing its core holding, the *Jenkins* majority considered what bases may "serve[] as a proxy for loyalty to the sheriff" and further "h[eld] that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity." *See* 119 F.3d at 1164. The *Jenkins* majority then took the opportunity to suggest that all deputy sheriffs everywhere *should* be subject to political firing, remarking:

> We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign for the candidate's opponent. . . . It was never contemplated that sheriffs must perform the powers and duties vested in them through deputies or assistants selected by someone else, and we do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him.

*Id.* at 1164-65 (alterations and internal quotation marks omitted). Nevertheless, it was at that point that the *Jenkins* majority "limit[ed] dismissals based on today's holding" — the holding that North Carolina deputy sheriffs are subject to political firings as "the alter ego

29

of the sheriff generally" — "to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." *Id.* at 1165. In other words, the *Jenkins* majority recognized that it was constrained to place some limitations on the *Elrod-Branti* exception, despite its apparent desire to apply the exception to all deputy sheriffs everywhere.

Indeed, that *Jenkins* limited its holding to North Carolina deputy sheriffs engaged in law enforcement activities as "the alter ego of the sheriff generally," and that it insists upon a position-specific *Elrod-Branti* analysis, is ultimately supported by not only *Jenkins* itself, but also more recent decisions of this Court. Those decisions include *Bland*, wherein we explained that, "to be true to *Jenkins*, we too must consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies before us *in light of the duties of their particular positions*." *See* 730 F.3d at 377. They also include *Lawson v. Union County Clerk of Court*, wherein we clarified that — in assigning the "alter-ego" designation to the *Jenkins* plaintiffs — the *Jenkins* majority's "analysis focused on the fact that deputy sheriffs held a special position under North Carolina law, in that they 'act[ed] in the name of and with powers coterminous with [their] principal, the elected sheriff.'" *See* 828 F.3d 239, 249 (4th Cir. 2016) (alterations in original) (quoting *Jenkins*, 119 F.3d at 1163).

## II.

As the foregoing discussion shows, there is simply no basis in precedent — including the *Jenkins v. Medford* decision on which my good colleagues almost

30

exclusively rely — to properly conclude that the *Elrod-Branti* exception allowed the political firing of plaintiff Mark McCaffrey from his position as a deputy sheriff in Virginia by Loudoun County Sheriff Michael Chapman. Indeed, any valid effort to analogize this matter to *Jenkins* would have to end with this: Nothing in McCaffrey's complaint or Virginia law establishes that McCaffrey was "the alter ego of [Sheriff Chapman] generally" and thus a policymaker who could lawfully be terminated for political reasons. *See Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc).

Specifically, McCaffrey's complaint relates that he was a "major crimes detective" and "lead" investigator who was "highly successful" and repeatedly awarded for his service. *See McCaffrey v. Chapman*, No. 1:17-cv-00937, at ¶¶ 6, 12 (E.D. Va. Aug. 21, 2017), ECF No. 1-2, (the "Complaint").[1] The Complaint explicitly disclaims, however, that McCaffrey was either "a policymaker" or "a spokesperson" for the sheriff's office. *Id.* ¶¶ 13-14. As the Complaint explains, the sheriff's office maintained "a strict, paramilitary chain-of-command structure," with Sheriff Chapman at the top and his seven "Senior Commanders" as the "Command Staff" tasked with supporting Chapman and advising him on policy matters. *Id.* ¶¶ 55-57. Employees like McCaffrey lower in the chain of command were "not policymakers" and did not "advise the Sheriff and the

---

[1] In his Complaint, McCaffrey alleges four claims, each premised upon his termination by Sheriff Chapman due to McCaffrey's support of Chapman's political opponent. McCaffrey pursues two claims against Chapman, primarily a 42 U.S.C. § 1983 claim for contravention of McCaffrey's rights under the First Amendment, plus an equivalent state claim for violation of the Virginia Constitution. McCaffrey also alleges derivative claims against Loudoun County and its Board of Supervisors.

31

Command Staff on matters of policy." *Id.* ¶ 57. Moreover, Chapman insisted on being "the only 'voice' and 'face' of the [sheriff's department] to the outside world." *Id.* ¶ 58. Chapman imposed limitations on the authority and discretion of his deputies — including McCaffrey — through the Sheriff's General Orders. *Id.* ¶ 37.[2]

The Sheriff's General Orders confirm that McCaffrey's position was near the bottom of the chain of command. Criminal cases were assigned to McCaffrey and other lead detectives only after having been screened by a section supervisor. *See* General Order 411.9(III)(E)(2). Once assigned, McCaffrey had the authority to conduct routine investigative tasks, such as interviewing witnesses and collecting evidence. *Id.* 411.12. But such investigative work was subject to "continuous screening" by supervisors in the sheriff's office in order for those supervisors to "better control the investigative efforts, workload and potential for success of their personnel and section." *Id.* 411.9(III)(E)(2)(d).

Meanwhile, there simply is no Virginia law that, like the North Carolina law crucial to the *Jenkins* holding, confers a "special status" on deputy sheriffs and accords them "'powers coterminous with . . . the elected sheriff.'" *See Jenkins*, 119 F.3d at 1163 (quoting N.C. Gen. Stat. § 17E-1). That is, there is no Virginia law that renders deputies "the alter ego of the sheriff generally." *See id.* at 1164. Rather, Virginia statutes enacted in 1997 permit the sheriff to appoint deputies "who *may* discharge any of the official

---

[2] Because the Sheriff's General Orders are incorporated into the Complaint by reference, they are properly considered here. *See Tellabs, Inc. v. Makor Issues & Right, Ltd.*, 551 U.S. 308, 321 (2007).

duties of their principal," *see* Va. Code Ann. § 15.2-1603 (emphasis added), but empower the sheriff to set "the terms and conditions" for the appointment of his deputies, *see id.* § 15.2-1600(B). As the Complaint and the General Orders establish, Sheriff Chapman did not opt to make McCaffrey his alter ego by exercising discretion to give McCaffrey powers coterminous with his. *Cf. Lawson v. Union Cnty. Clerk of Court*, 828 F.3d 239, 249 (4th Cir. 2016) (explaining that *Elrod-Branti* exception did not apply under *Jenkins* where statute authorized deputy to perform all functions of court clerk, but court clerk did not assign deputy policymaking duties).

Remarkably, today's panel majority does not even mention "coterminous" powers and barely discusses the "alter ego" language of *Jenkins*. In a footnote, the majority observes that this "dissent emphasizes that *Jenkins* hinged on this Court's finding that in North Carolina, deputy sheriffs are alter egos of sheriffs." *See ante* 16 n.6. Relying on an outdated federal district court decision and two even older decisions of the Supreme Court of Appeals of Virginia, the majority then declares that "Virginia case law" is "clear" that a deputy sheriff "'is not simply the "alter ego" of the sheriff, but he is one and the same as the sheriff.'" *Id.* (quoting *Whited v. Fields*, 581 F. Supp. 1444, 1454 (W.D. Va. 1984), and citing *Bd. of Supervisors v. Lucas*, 128 S.E. 574 (Va. 1925), and *Mosby's Adm'r v. Mosby's Adm'r*, 50 Va. (9 Gratt.) 584 (1853)). Critically, the decisions invoked by the majority long pre-date the 1997 Virginia statutes authorizing sheriffs to decide which of their powers to confer upon — and to withhold from — their deputies. Moreover, neither of the Virginia decisions ruled or contemplated that Virginia deputy sheriffs ever possessed powers that would render them the "alter ego" of the sheriff under

33

*Jenkins*, i.e., powers coterminous with those of the sheriff. *See Lucas*, 128 S.E. at 576 (concluding that a deputy was subject to an elected sheriff's exclusion from the Virginia Workmen's Compensation Act, in that "[a] deputy can only come into being by virtue of the appointment of a sheriff" and thus "a sheriff and a deputy sheriff are one" under the law); *Mosby's Adm'r*, 50 Va. (9 Gratt.) at 602-05 (explaining when sheriff may, and may not, be considered "one" with his deputy and thereby held liable for deputy's acts).

Aside from its cursory and unsound "alter ego" discussion, the majority cherry picks other language from *Jenkins* and distorts that decision to even more broadly hold that any deputy sheriff tasked with law enforcement anywhere may be terminated for political reasons. *See ante* 12 n.5 (asserting that "*Jenkins* was not 'cabined' to North Carolina sheriffs and deputy sheriffs as the dissent suggests"). The majority particularly relies on the discussion in *Jenkins* that began, "We hold that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity," and that included the commentary, "[W]e do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him." *See Jenkins*, 199 F.3d at 1164-65.

To be sure, that passage in *Jenkins* conveyed the message that all deputy sheriffs everywhere *should* be subject to political firings. *Jenkins* simply gave that commentary, however, in the course of explaining that — where a deputy sheriff falls within the *Elrod-Branti* exception based on his particular functions — he *can* be terminated for either his "party affiliation" or his "campaign activity." Contrary to the majority, that discussion did not constitute a "holding" that each and every deputy sheriff who has "'expressed

34

clear opposition to [the sheriff]'" may be fired. *See ante* 11 (quoting *Jenkins*, 119 F.3d at 1165); *see also id.* at 14 (asserting that "Sheriff Chapman was entitled to carry out the policies on which he ran and won with deputy sheriffs who did not oppose his re-election").

The majority further misrepresents *Jenkins* to simply instruct that, "[i]n determining whether the deputy sheriff's duties and responsibilities fall within the *Elrod-Branti* exception, . . . we look to whether [the] deputy sheriff [was] 'actually sworn to engage in law enforcement activities on behalf of the sheriff.'" *See ante* 16 (quoting *Jenkins*, 119 F.3d at 1165). According to the majority, *Jenkins* "made clear" that "a sworn deputy sheriff like McCaffrey had a special role in carrying out the law enforcement policies, goals and priorities on which Sheriff Chapman campaigned and prevailed." *Id.* at 14. That is, all that matters to the majority's *Elrod-Branti* analysis is that the allegations of the Complaint — indicating that McCaffrey "was a lead investigator of high-profile crimes" and received awards and recognition for his work — establish that "McCaffrey engaged in law enforcement functions on behalf of the sheriff." *Id.* at 13. The majority expressly discounts the fact that, under the Complaint, McCaffrey was neither a policymaker nor a spokesperson for the sheriff's office, and that, pursuant to the Sheriff's General Orders, McCaffrey had circumscribed powers and was not high enough in the chain-of-command to have a policymaking role. *Id.* at 16.[3]

---

[3] As the majority would have it, *Jenkins* and our subsequent precedent have established a test under which a deputy sheriff is either subject to political firing because he is tasked with law enforcement, or protected from political firing because he is a low-
(Continued)

35

Of course, as *Jenkins* itself emphasized and our Court has repeatedly recognized over the years, *Jenkins* did not hold that law enforcement responsibilities render any deputy sheriff eligible for political firing. Rather, *Jenkins* actually held that North Carolina deputy sheriffs tasked with law enforcement are policymakers who fall within the *Elrod-Branti* exception because, under North Carolina law, they are "the alter ego of the sheriff generally." *See* 119 F.3d at 1164. Before today, the chief criticism of *Jenkins* was that it could be read to authorize the political firings of any and all North Carolina deputy sheriffs, no matter their job responsibilities. But now, *Jenkins* has been interpreted even more broadly and egregiously, to allow the political firings of any and all deputy sheriffs anywhere, so long as they are simply tasked with law enforcement.

In ruling as it does, the majority not only misreads *Jenkins*, but also disregards other controlling precedent of this Court and the Supreme Court. Contrary to our instruction that "low-level policymaking authority does not outweigh an employee's First Amendment rights of political affiliation," the majority has made political firings a possibility for middle- and lower-level government employees. *See Fields v. Prater*, 566

---

level jailer whose duties are "custodial." *See ante* 16-17 (reasoning that "the *Elrod-Branti* exception applies to McCaffrey" because his Complaint "leave[s] no doubt that he was a deputy sheriff engaged in law enforcement activities and was not performing 'custodial' duties like the deputies in [*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013), and *Knight v. Vernon*, 214 F.3d 544 (4th Cir. 2000)]"); *see also id.* at 12 n.5. Nonetheless, there is no support for such a simplistic test in *Jenkins*, *Bland*, or *Knight*, which all recognize that the *Elrod-Branti* analysis requires an examination of the specific duties of the particular position at issue to assess whether political loyalty is an appropriate job requirement.

36

F.3d 381, 387 (4th Cir. 2009) (alterations and internal quotation marks omitted). Merely by performing "law enforcement activities," any beat cop in our bailiwick can now be fired for not having the right political association. Such a result was never contemplated by the Supreme Court in developing what is supposed to be the narrow *Elrod-Branti* exception. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74, 76 (1990) (explaining that the narrow *Elrod-Branti* exception applies to only "certain high-level employees," as "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate"). And it should not be countenanced by our Court.

## III.

Conducting a proper assessment of McCaffrey's deputy sheriff position, we can assume under the first prong of our *Stott* test that — "at a very high level of generality," *see Fields v. Prater*, 566 F.3d 381, 386 (4th Cir. 2009) — the position implicates "partisan political interests or concerns." *See Stott v. Haworth*, 916 F.2d 134, 141 (4th Cir. 1990) (alterations and internal quotation marks omitted). That is, we can rely here on what was apparently the first *Stott* prong analysis in *Jenkins v. Medford*, 119 F.3d 1156, 1162-63 (4th Cir. 1997) (en banc) (explaining, inter alia, that deputy sheriffs

generally "play a special role in implementing the sheriff's policies and goals," as espoused by the sheriff on the campaign trail).[4]

Turning to the second *Stott* prong, however, the allegations of the Complaint reveal that McCaffrey did not act as "a policymaker, a privy to confidential information, a communicator, or some other office holder" for whom political considerations are appropriate job requirements. *See Stott*, 916 F.2d at 142 (internal quotation marks omitted). McCaffrey's limited realm of investigative duties, although important, neither required nor benefitted from "a particular political philosophy." *See Lawson v. Union Cnty. Clerk of Court*, 828 F.3d 239, 248 (4th Cir. 2016). Furthermore, given the constraints on his job performance and his position at the bottom of Sheriff Chapman's chain of command, McCaffrey's duties did not involve "setting or implementing a policy agenda." *See id.* at 249.

---

[4] My willingness to assume that the first *Stott* prong has been satisfied should not be interpreted as an endorsement of the *Jenkins* analysis. I have serious doubts as to whether that analysis was too general, and whether it should have focused more on deputies with the job responsibilities of the plaintiffs. Here, that would mean looking at boots-on-the-ground investigators of violent crimes like McCaffrey. I question whether such a deputy can ever make decisions that leave room for political disagreement, as we should always adhere to the principle that "[p]olitics should not be an active ingredient of good law enforcement." *See Mitchell v. Thompson*, 18 F.3d 425, 428 (7th Cir. 1994) (Wood, J., dissenting). In any event, I certainly do not sanction the panel majority's analysis, which focused on McCaffrey specifically but invented facts in so doing. Notwithstanding the Complaint's silence as to Sheriff Chapman's campaign platform, the majority pronounces that "Chapman won an election for sheriff after espousing positions on how the [sheriff's office] should be run," and that McCaffrey's "duties and responsibilities involved carrying out . . . Chapman's policies and priorities." *See ante* 13.

That McCaffrey worked on important cases in a "lead" role does not mean that his employment was subject to political considerations. *See Lawson*, 828 F.3d at 249 (explaining that supervisory title does not establish that employee was policymaker). Indeed, as we have consistently made clear, "a supervisory employee does not automatically hold a position that is subject to the *Elrod-Branti* exception." *See id.*; *see also Fields*, 566 F.3d at 387 (recognizing that supervisory responsibilities alone do not permit application of *Elrod-Branti* exception). A managerial role over a limited number of employees and decisions does not necessitate that a person in such a position has "broad policy setting power." *See Lawson*, 828 F.3d at 249. And because of the strict hierarchy in Sheriff Chapman's office, as well as the levels of approval and screening incorporated therein, McCaffrey merely performed routine investigative tasks and lacked any "broad policy setting power." Although those responsibilities involved "some discretion," discretion does not alone make a deputy a "policymaker," for which political allegiance is an appropriate job requirement. *See Bland v. Roberts*, 730 F.3d 368, 378 (4th Cir. 2013). To conclude otherwise would leave "only the most low-level government employees" protected from political firings. *See Fields*, 566 F.3d at 387.

McCaffrey's achievements and commendations for his exemplary service also do not render him subject to political firing. In 2015 — the year that McCaffrey was terminated because of politics — he received the "Loudoun County Investigator of the Month Award" three times, and also was part of a team designated as "Team of the Month" on three occasions. *See* Complaint ¶ 12. And it was not just his coworkers at the sheriff's office who recognized McCaffrey's good work; the local commonwealth's

39

attorney awarded McCaffrey the "Victim Services Award" in 2014. *Id.* Those commendations show McCaffrey's effectiveness, which was also illustrated by his case closure rate that greatly exceeded the national average. *Id.* But McCaffrey's stellar work does not establish that he possessed the broad discretion that would remove his First Amendment protections and render him subject to the *Elrod-Branti* exception. A law enforcement officer can excel in his duties without becoming a policymaker. Indeed, it would be odd to permit a law officer to be fired for political reasons because of his success. If anything, the commendations for good work received by McCaffrey show that he performed his duties as a deputy sheriff without exceeding his authority, responded appropriately to his supervisors, and adhered to their orders. On the other hand, McCaffrey's awards fail to show that "there is a rational connection between shared [political] ideology and job performance." *See Stott*, 916 F.2d at 142 (internal quotation marks omitted).

Finally, the statutory provisions governing Virginia law enforcement support the conclusion that the *Elrod-Branti* exception does not apply here. As we have recognized, "whether state law prohibits politically-based hiring for a particular position is relevant to whether political [allegiance] is necessary for effective job performance." *See Fields*, 566 F.3d at 388 (internal quotation marks omitted). And the Virginia Code explicitly prohibits "law-enforcement officers [from] discriminat[ing] against any employee or applicant for employment because of that person's political affiliations or political activities." *See* Va. Code Ann. § 15.2-1512.2(D). Virginia law also provides that a deputy sheriff may not be prohibited from "voting"; "expressing opinions, privately or

40

publicly, on political subjects and candidates"; "displaying a political picture, sign, sticker, badge, or button"; "participating in the activities of . . . a political candidate or campaign"; or "attending or participating in a political convention." *Id.* § 15.2-1512.2(B)-(C). Virginia law thus confirms the impermissibility of McCaffrey being fired for a lack of political loyalty. In these circumstances, McCaffrey is entitled to proceed with his claims.[5]

IV.

Pursuant to the foregoing, I would vacate the district court's dismissal of McCaffrey's Complaint and remand for further proceedings.

I therefore respectfully dissent.

---

[5] As a final point, the majority has implicitly ruled that the district court erred in failing to assess McCaffrey's claims under the *Pickering* and *Connick* decisions. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983). Rather than remand to rectify that error, however, the majority itself has conducted the fact-intensive *Pickering-Connick* analysis and resolved the issue in favor of the defendants. It bears emphasizing that "we are a court of review, not of first view." *See Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).