KING, Circuit Judge, dissenting:
 

 Two decades ago, in
 
 Jenkins v. Medford
 
 , our en banc majority concluded that the plaintiff North Carolina deputy sheriffs were the "alter ego" of the elected sheriff and thus could be terminated for political reasons under the
 
 Elrod-Branti
 
 exception.
 
 See
 

 119 F.3d 1156
 
 , 1164 (4th Cir. 1997) (en banc). The
 
 Jenkins
 
 dissenters protested - quite rightfully, in my view - that the majority "ma[de] the
 
 Elrod
 

 -
 

 Branti
 
 exception into the rule" and thereby "eviscerate[d] the First Amendment protections those cases guaranteed to government workers like the [plaintiffs]."
 

 Id.
 

 at 1169
 
 (Motz, J., dissenting). At least, however,
 
 Jenkins
 
 must be read as predicated on specifics of North Carolina law and limited to North Carolina deputy sheriffs engaged in law enforcement activities. Unfortunately, that has not constrained my esteemed colleagues from ruling today - purportedly in reliance on
 
 Jenkins
 
 but actually going much farther - that any deputy sheriff tasked with law enforcement anywhere is subject to political firing. As explained further herein, I respectfully dissent.
 

 I.
 

 In demonstrating that my friends have gone too far, I begin with a discussion of
 the settled legal principles concerning the political firings of public employees and the considerations that undergird the
 
 Elrod
 

 -
 

 Branti
 
 exception, with emphasis on the controlling Supreme Court authority. I also outline this Court's two-prong test for conducting a proper
 
 Elrod
 

 -
 

 Branti
 
 analysis and then carefully examine our
 
 Jenkins v. Medford
 
 decision.
 

 A.
 

 The Supreme Court has underscored that, in most situations, adverse employment actions based on political considerations "impermissibly encroach on First Amendment freedoms."
 
 See
 

 Rutan v. Republican Party of Ill.
 
 ,
 
 497 U.S. 62
 
 , 74,
 
 110 S.Ct. 2729
 
 ,
 
 111 L.Ed.2d 52
 
 (1990). The Constitution's prohibition against political firings is thus the default rule. Politically motivated employment terminations, however, are permissible - under the
 
 Elrod
 

 -
 

 Branti
 
 exception - if those "practices are narrowly tailored to further vital government interests."
 

 Id.
 

 In
 
 Elrod v. Burns
 
 in 1976, the Supreme Court recognized that the First Amendment protects public employees from being fired "solely for the reason that they were not affiliated with" a certain political party or candidate.
 
 See
 

 427 U.S. 347
 
 , 350,
 
 96 S.Ct. 2673
 
 ,
 
 49 L.Ed.2d 547
 
 (1976) (plurality opinion). According to the Court, conditioning the employment of a public servant on political loyalty "unquestionably inhibits protected belief and association," and terminations of public employees for a lack of political loyalty penalize the exercise of those protected rights.
 

 Id.
 

 at 359
 
 ,
 
 96 S.Ct. 2673
 
 . Consistent with that principle, the Court concluded that the
 
 Elrod
 
 plaintiffs - one of whom was a chief deputy sheriff - had successfully alleged claims for violations of their First Amendment rights by specifying that they were fired by the sheriff because of their party affiliations.
 

 Id.
 

 at 350, 373
 
 ,
 
 96 S.Ct. 2673
 
 . But the Court carved out the exception that, for certain policymaking positions, terminations based on political allegiance - and the corresponding restraint on those employees' freedoms of belief and association - are justified to safeguard our form of representative government.
 

 Id.
 

 at 367-68
 
 ,
 
 96 S.Ct. 2673
 
 .
 

 Just four years later, in
 
 Branti v. Finkel
 
 , the Court refined
 
 Elrod
 
 's policymaker exception and clarified that political terminations are only permissible where "the hiring authority can demonstrate that [political loyalty] is an appropriate requirement for the effective performance of the public office involved."
 
 See
 

 445 U.S. 507
 
 , 518,
 
 100 S.Ct. 1287
 
 ,
 
 63 L.Ed.2d 574
 
 (1980). Accordingly, as the Court explained, the labels that may be applied to a public employee, such as "policymaker" or "confidential," are not dispositive of whether that employee may be fired because of political loyalty.
 

 Id.
 

 Adhering to Supreme Court precedent, this Court and our sister courts of appeals have recognized that the
 
 Elrod
 

 -
 

 Branti
 
 exception is "narrow" and must always be applied with caution.
 
 See
 

 Bland v. Roberts
 
 ,
 
 730 F.3d 368
 
 , 374 (4th Cir. 2013) ("
 
 Elrod
 
 created a narrow exception ....");
 
 Stott v. Haworth
 
 ,
 
 916 F.2d 134
 
 , 140 (4th Cir. 1990) (explaining that
 
 Elrod
 
 and
 
 Branti
 
 were "specific, narrow application[s] of" exception to principle against infringement of First Amendment rights (internal quotation marks omitted));
 
 see also
 

 Thompson v. Shock
 
 ,
 
 852 F.3d 786
 
 , 793 (8th Cir. 2017) (describing application of "narrow
 
 Elrod
 

 -
 

 Branti
 
 justification test" (alteration and internal quotation marks omitted));
 
 Hunt v. Cnty. of Orange
 
 ,
 
 672 F.3d 606
 
 , 611 (9th Cir. 2012) ("[W]e have held that the [
 
 Elrod
 

 -
 

 Branti
 
 ] exception is 'narrow' and should be applied with caution." (quoting
 
 DiRuzza v. Cnty. of Tehama
 
 ,
 
 206 F.3d 1304
 
 , 1308 (9th Cir. 2000) ));
 
 Assaf v. Fields
 
 ,
 
 178 F.3d 170
 
 , 177 (3d Cir. 1999) (giving guidance as to when a position will "meet the narrow
 
 Branti
 

 -
 

 Elrod
 
 exception").
 

 Again, the
 
 Elrod
 

 -
 

 Branti
 
 exception must always be applied narrowly, to prevent the coercion of the beliefs and associations of public servants.
 
 See
 

 O'Hare Truck Serv., Inc.v. City of Northlake
 
 ,
 
 518 U.S. 712
 
 , 718,
 
 116 S.Ct. 2353
 
 ,
 
 135 L.Ed.2d 874
 
 (1996) ("
 
 Elrod
 
 and
 
 Branti
 
 establish that patronage does not justify the coercion of a person's political beliefs and associations."). At bottom, the
 
 Elrod
 

 -
 

 Branti
 
 exception is reserved for those exceptional and "high-level" government positions for which interference with the "employees' freedom to believe and associate" is justified by the effective implementation of government policy.
 
 See
 

 Rutan
 
 ,
 
 497 U.S. at 74-76
 
 ,
 
 110 S.Ct. 2729
 
 .
 

 B.
 

 In
 
 Stott v. Haworth
 
 in 1990, our Judge Russell identified the two-prong test for conducting the
 
 Elrod-Branti
 
 analysis.
 
 See
 

 916 F.2d at 141-43
 
 . The threshold inquiry is whether the position at issue implicates "partisan political interests or concerns."
 

 Id.
 

 at 141
 
 (alterations and internal quotation marks omitted). Thus, pursuant to the first prong of the
 
 Stott
 
 test, we inspect whether "the position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation."
 

 Id.
 

 (internal quotation marks omitted). If that question is answered in the affirmative, we turn to the
 
 Stott
 
 test's second prong, under which we "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that [political loyalty] is an equally appropriate requirement."
 

 Id.
 

 at 142
 
 (internal quotation marks omitted).
 

 Although the first
 
 Stott
 
 prong "requires us to examine the issues dealt with by the employee 'at a very high level of generality,' " the second prong " 'requires a much more concrete analysis of the specific position at issue.' "
 
 See
 

 Bland
 
 ,
 
 730 F.3d at 375
 
 (quoting
 
 Fields v. Prater
 
 ,
 
 566 F.3d 381
 
 , 386 (4th Cir. 2009) ). Significantly, the Supreme Court and our Court have consistently emphasized that we are obliged to examine the specific duties of a "particular position," not merely the general nature thereof.
 
 See
 

 Branti
 
 ,
 
 445 U.S. at 518
 
 ,
 
 100 S.Ct. 1287
 
 (explaining that the ultimate inquiry assesses whether politics is "an appropriate requirement for the effective performance of the public office involved");
 
 Stott
 
 ,
 
 916 F.2d at 142
 
 (describing dispositive inquiry as "particular responsibilities" "of the public office in question" (internal quotation marks omitted)).
 

 C.
 

 In
 
 Jenkins v. Medford
 
 in 1997, our en banc majority acknowledged the
 
 Stott
 
 test and ruled that the
 
 Elrod
 

 -
 

 Branti
 
 exception permitted the political firings of North Carolina deputy sheriffs engaged in law enforcement activities.
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1162-65
 
 . As broad as that holding was, we have recognized that
 
 Jenkins
 
 can be read even more broadly, to allow the political firings of any and all deputy sheriffs in North Carolina.
 
 See
 

 id.
 

 at 1166
 
 (Motz, J., dissenting) (protesting that "the majority broadly holds that
 
 all
 
 deputy sheriffs in North Carolina - regardless of their actual duties - are policymaking officials");
 
 see also
 

 Bland
 
 ,
 
 730 F.3d at 377
 
 (confronting "a significant amount of language in [
 
 Jenkins
 
 ] seemingly indicating that all North Carolina deputies could be terminated for political reasons regardless of the specific duties of the particular deputy
 in question"). In the face of the "very mixed signals" sent by
 
 Jenkins
 
 , however, we have resolved "that
 
 Jenkins
 
 is best read as analyzing the duties of the particular deputies before the court," i.e., North Carolina deputies tasked with law enforcement.
 
 See
 

 Bland
 
 ,
 
 730 F.3d at 391
 
 . Indeed, that is the only way to read
 
 Jenkins
 
 in a manner even arguably consistent with the controlling Supreme Court precedent.
 

 Although it did not explicitly refer to the first
 
 Stott
 
 prong in doing so, the
 
 Jenkins
 
 majority began its
 
 Elrod
 

 -
 

 Branti
 
 analysis with what was apparently an inquiry into how the position of deputy sheriff relates to partisan political interests or concerns.
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1162-63
 
 . Invoking decisions of other courts of appeals,
 
 Jenkins
 
 determined that a sheriff's election by popular vote "indicates voter approval of [the sheriff's] espoused platform and general agreement with [his] expressed political agenda"; "[t]he sheriff owes a duty to the electorate and the public at large to ensure that his espoused policies are implemented"; and "[d]eputy sheriffs play a special role in implementing the sheriff's policies and goals."
 

 Id.
 

 at 1162
 
 (internal quotation marks omitted). As examples of the "special role" that may be played by deputies in implementing the sheriff's policies and goals,
 
 Jenkins
 
 specified that deputies may be included in the sheriff's "core group of advisors," may "work autonomously" while "exercising significant discretion," and may "make some decisions that actually create policy."
 

 Id.
 

 (internal quotation marks omitted).
 
 Jenkins
 
 further noted that the sheriff may rely "on his deputies to foster public confidence in law enforcement" and expect them to provide "the truthful and accurate information he needs to do his job."
 

 Id.
 

 Finally,
 
 Jenkins
 
 observed that, "[i]n some jurisdictions, the deputy sheriff is the general agent of the sheriff, and the sheriff is civilly liable for the acts of his deputy."
 

 Id.
 

 at 1162-63
 
 .
 

 The
 
 Jenkins
 
 majority only then turned, albeit without naming the second
 
 Stott
 
 prong, to the
 
 Elrod
 

 -
 

 Branti
 
 inquiry concerning the particular responsibilities of the plaintiff North Carolina deputy sheriffs.
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1163
 
 ("[W]e now consider the specific political and social roles of sheriffs and their deputies in North Carolina."). That examination led to the following holding:
 

 [We] conclude that in North Carolina, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are
 
 the alter ego of the sheriff generally
 
 , for whose conduct he is liable. We therefore hold that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the
 
 Elrod
 

 -
 

 Branti
 
 exception to prohibited political terminations.
 

 Id.
 

 at 1164
 
 (emphasis added).
 

 The North Carolina deputy sheriffs' role as "the alter ego of the sheriff generally" was plainly crucial to the
 
 Jenkins
 
 majority and an explicit part of its succinct holding. In designating North Carolina deputy sheriffs as the sheriff's alter ego,
 
 Jenkins
 
 relied on a combination of factors. Of obvious and exceptional importance,
 
 Jenkins
 
 highlighted that the North Carolina legislature had "recognized the special status of sheriffs' deputies in the eyes of the law."
 
 See
 

 119 F.3d at 1163
 
 . Specifically,
 
 Jenkins
 
 pointed to the legislature's findings related to sheriffs and their deputies. As part of those findings, as quoted in
 
 Jenkins
 
 , the legislature related that " '[t]he deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff.' "
 

 Id.
 

 (quoting N.C. Gen. Stat. § 17E-1 ).
 

 The
 
 Jenkins
 
 majority elaborated that, although "[t]he sheriff may not delegate
 final responsibility for his official duties, ... he may appoint deputies to assist him [and] can be held liable for the misbehavior of the deputies."
 
 See
 

 119 F.3d at
 
 1163 (citing, inter alia,
 
 N.C. Gen. Stat. § 162-24
 
 ). Additionally,
 
 Jenkins
 
 cited the North Carolina legislature's declaration "that '[t]he offices of sheriff and deputy sheriff are ... of special concern to the public health, safety, welfare and morals of the people of the State,' " as well as the legislature's mandatory procedure for filling a vacancy in the office of sheriff by accepting the recommendation of the elected sheriff's political party.
 

 Id.
 

 (citing N.C. Gen. Stat. §§ 17E-1, 162-5.1 ).
 
 Jenkins
 
 also recognized that - presumably due to the special status of North Carolina deputy sheriffs - "the legislature has made deputies at-will employees, who 'shall serve at the pleasure of the appointing officer.' "
 

 Id.
 

 at 1163-64
 
 (quoting N.C. Gen. Stat. § 153A-103(2) ).
 

 Notwithstanding the language indicating that all North Carolina deputy sheriffs are policymakers subject to political firings, the
 
 Jenkins
 
 majority eventually cabined its decision to those deputies whose particular functions rendered them "the alter ego of the sheriff generally," i.e., "those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff."
 
 See
 

 119 F.3d at 1165
 
 . Moreover,
 
 Jenkins
 
 is replete with language that limits its pronouncements to
 
 North Carolina
 
 deputies tasked with law enforcement.
 
 See, e.g.
 
 ,
 

 id.
 

 at 1163
 
 (turning to analysis of "specific political and social roles of sheriffs and their deputies
 
 in North Carolina
 
 " (emphasis added));
 

 id.
 

 at 1164
 
 (concluding that "
 
 in North Carolina
 
 , the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable" (emphasis added));
 

 id.
 

 ( "hold[ing] that such
 
 North Carolina
 
 deputy sheriffs may be lawfully terminated for political reasons" (emphasis added)).
 

 Although it did not explicitly peg its analysis to the two
 
 Stott
 
 prongs, the
 
 Jenkins
 
 majority also underscored the applicability of the
 
 Stott
 
 test and the need to examine the particular position at issue.
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1164
 
 (instructing that "the district courts are to engage in a
 
 Stott
 
 -type analysis, examining the specific position at issue, as we have done here today");
 

 id.
 

 at 1165
 
 (explaining "that courts examine the job duties of the position, and not merely the title, of those dismissed").
 

 After announcing its core holding, the
 
 Jenkins
 
 majority considered what bases may "serve[ ] as a proxy for loyalty to the sheriff" and further "h[eld] that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity."
 
 See
 

 119 F.3d at 1164
 
 . The
 
 Jenkins
 
 majority then took the opportunity to suggest that all deputy sheriffs everywhere
 
 should
 
 be subject to political firing, remarking:
 

 We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign for the candidate's opponent. ... It was never contemplated that sheriffs must perform the powers and duties vested in them through deputies or assistants selected by someone else, and we do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him.
 

 Id.
 

 at 1164-65
 
 (alterations and internal quotation marks omitted). Nevertheless, it was at that point that the
 
 Jenkins
 
 majority "limit[ed] dismissals based on today's holding" - the holding that North Carolina deputy sheriffs are subject to political firings
 as "the alter ego of the sheriff generally" - "to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff."
 

 Id.
 

 at 1165
 
 . In other words, the
 
 Jenkins
 
 majority recognized that it was constrained to place some limitations on the
 
 Elrod
 

 -
 

 Branti
 
 exception, despite its apparent desire to apply the exception to all deputy sheriffs everywhere.
 

 Indeed, that
 
 Jenkins
 
 limited its holding to North Carolina deputy sheriffs engaged in law enforcement activities as "the alter ego of the sheriff generally," and that it insists upon a position-specific
 
 Elrod
 

 -
 

 Branti
 
 analysis, is ultimately supported by not only
 
 Jenkins
 
 itself, but also more recent decisions of this Court. Those decisions include
 
 Bland
 
 , wherein we explained that, "to be true to
 
 Jenkins
 
 , we too must consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies before us
 
 in light of the duties of their particular positions
 
 ."
 
 See
 

 730 F.3d at 377
 
 . They also include
 
 Lawson v. Union County Clerk of Court
 
 , wherein we clarified that - in assigning the "alter-ego" designation to the
 
 Jenkins
 
 plaintiffs - the
 
 Jenkins
 
 majority's "analysis focused on the fact that deputy sheriffs held a special position under North Carolina law, in that they 'act[ed] in the name of and with powers coterminous with [their] principal, the elected sheriff.' "
 
 See
 

 828 F.3d 239
 
 , 249 (4th Cir. 2016) (alterations in original) (quoting
 
 Jenkins
 
 ,
 
 119 F.3d at
 
 1163 ).
 

 II.
 

 As the foregoing discussion shows, there is simply no basis in precedent - including the
 
 Jenkins v. Medford
 
 decision on which my good colleagues almost exclusively rely - to properly conclude that the
 
 Elrod
 

 -
 

 Branti
 
 exception allowed the political firing of plaintiff Mark McCaffrey from his position as a deputy sheriff in Virginia by Loudoun County Sheriff Michael Chapman. Indeed, any valid effort to analogize this matter to
 
 Jenkins
 
 would have to end with this: Nothing in McCaffrey's complaint or Virginia law establishes that McCaffrey was "the alter ego of [Sheriff Chapman] generally" and thus a policymaker who could lawfully be terminated for political reasons.
 
 See
 

 Jenkins v. Medford
 
 ,
 
 119 F.3d 1156
 
 , 1164 (4th Cir. 1997) (en banc).
 

 Specifically, McCaffrey's complaint relates that he was a "major crimes detective" and "lead" investigator who was "highly successful" and repeatedly awarded for his service.
 
 See
 

 McCaffrey v. Chapman
 
 , No. 1:17-cv-00937, at ¶¶ 6, 12 (E.D. Va. Aug. 21, 2017), ECF No. 1-2, (the "Complaint").
 
 [1]
 
 The Complaint explicitly disclaims, however, that McCaffrey was either "a policymaker" or "a spokesperson" for the sheriff's office.
 
 Id.
 
 ¶¶ 13-14. As the Complaint explains, the sheriff's office maintained "a strict, paramilitary chain-of-command structure," with Sheriff Chapman at the top and his seven "Senior Commanders" as the "Command Staff" tasked with supporting Chapman and advising him on policy matters.
 
 Id.
 
 ¶¶ 55-57. Employees like McCaffrey lower in the chain of command were "not policymakers" and did not "advise the Sheriff and the Command Staff on matters of policy."
 
 Id.
 
 ¶ 57. Moreover, Chapman insisted on
 being "the only 'voice' and 'face' of the [sheriff's department] to the outside world."
 
 Id.
 
 ¶ 58. Chapman imposed limitations on the authority and discretion of his deputies - including McCaffrey - through the Sheriff's General Orders.
 
 Id.
 
 ¶ 37.
 
 [2]
 

 The Sheriff's General Orders confirm that McCaffrey's position was near the bottom of the chain of command. Criminal cases were assigned to McCaffrey and other lead detectives only after having been screened by a section supervisor.
 
 See
 
 General Order 411.9(III)(E)(2). Once assigned, McCaffrey had the authority to conduct routine investigative tasks, such as interviewing witnesses and collecting evidence.
 
 Id.
 
 411.12. But such investigative work was subject to "continuous screening" by supervisors in the sheriff's office in order for those supervisors to "better control the investigative efforts, workload and potential for success of their personnel and section."
 
 Id.
 
 411.9(III)(E)(2)(d).
 

 Meanwhile, there simply is no Virginia law that, like the North Carolina law crucial to the
 
 Jenkins
 
 holding, confers a "special status" on deputy sheriffs and accords them " 'powers coterminous with ... the elected sheriff.' "
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1163
 
 (quoting N.C. Gen. Stat. § 17E-1 ). That is, there is no Virginia law that renders deputies "the alter ego of the sheriff generally."
 
 See
 

 id.
 

 at 1164
 
 . Rather, Virginia statutes enacted in 1997 permit the sheriff to appoint deputies "who
 
 may
 
 discharge any of the official duties of their principal,"
 
 see
 

 Va. Code Ann. § 15.2-1603
 
 (emphasis added), but empower the sheriff to set "the terms and conditions" for the appointment of his deputies,
 
 see
 
 id.
 

 § 15.2-1600(B). As the Complaint and the General Orders establish, Sheriff Chapman did not opt to make McCaffrey his alter ego by exercising discretion to give McCaffrey powers coterminous with his.
 
 Cf.
 

 Lawson v. Union Cnty. Clerk of Court
 
 ,
 
 828 F.3d 239
 
 , 249 (4th Cir. 2016) (explaining that
 
 Elrod
 

 -
 

 Branti
 
 exception did not apply under
 
 Jenkins
 
 where statute authorized deputy to perform all functions of court clerk, but court clerk did not assign deputy policymaking duties).
 

 Remarkably, today's panel majority does not even mention "coterminous" powers and barely discusses the "alter ego" language of
 
 Jenkins
 
 . In a footnote, the majority observes that this "dissent emphasizes that
 
 Jenkins
 
 hinged on this Court's finding that in North Carolina, deputy sheriffs are alter egos of sheriffs."
 
 See
 

 ante
 
 ---- n.6. Relying on an outdated federal district court decision and two even older decisions of the Supreme Court of Appeals of Virginia, the majority then declares that "Virginia case law" is "clear" that a deputy sheriff " 'is not simply the "alter ego" of the sheriff, but he is one and the same as the sheriff.' "
 

 Id.
 

 (quoting
 
 Whited v. Fields
 
 ,
 
 581 F.Supp. 1444
 
 , 1454 (W.D. Va. 1984), and citing
 
 Bd. of Supervisors v. Lucas
 
 ,
 
 142 Va. 84
 
 ,
 
 128 S.E. 574
 
 (1925), and
 
 Mosby's Adm'r v. Mosby's Adm'r
 
 ,
 
 50 Va. (9 Gratt.) 584
 
 (1853) ). Critically, the decisions invoked by the majority long pre-date the 1997 Virginia statutes authorizing sheriffs to decide which of their powers to confer upon - and to withhold from - their deputies. Moreover, neither of the Virginia decisions ruled or contemplated that Virginia deputy sheriffs ever possessed powers that would render them the "alter ego" of the sheriff under
 
 Jenkins
 
 , i.e., powers coterminous with those of the sheriff.
 
 See
 

 Lucas
 
 ,
 
 128 S.E. at 576
 
 (concluding that a deputy was subject to an elected sheriff's
 exclusion from the Virginia Workmen's Compensation Act, in that "[a] deputy can only come into being by virtue of the appointment of a sheriff" and thus "a sheriff and a deputy sheriff are one" under the law);
 
 Mosby's Adm'r
 
 , 50 Va. (9 Gratt.) at 602-05 (explaining when sheriff may, and may not, be considered "one" with his deputy and thereby held liable for deputy's acts).
 

 Aside from its cursory and unsound "alter ego" discussion, the majority cherry picks other language from
 
 Jenkins
 
 and distorts that decision to even more broadly hold that any deputy sheriff tasked with law enforcement anywhere may be terminated for political reasons.
 
 See
 

 ante
 
 ---- n.5 (asserting that "
 
 Jenkins
 
 was not 'cabined' to North Carolina sheriffs and deputy sheriffs as the dissent suggests"). The majority particularly relies on the discussion in
 
 Jenkins
 
 that began, "We hold that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity," and that included the commentary, "[W]e do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him."
 
 See
 

 Jenkins
 
 ,
 
 119 F.3d at 1164-65
 
 .
 

 To be sure, that passage in
 
 Jenkins
 
 conveyed the message that all deputy sheriffs everywhere
 
 should
 
 be subject to political firings.
 
 Jenkins
 
 simply gave that commentary, however, in the course of explaining that - where a deputy sheriff falls within the
 
 Elrod
 

 -
 

 Branti
 
 exception based on his particular functions - he
 
 can
 
 be terminated for either his "party affiliation" or his "campaign activity." Contrary to the majority, that discussion did not constitute a "holding" that each and every deputy sheriff who has " 'expressed clear opposition to [the sheriff]' " may be fired.
 
 See
 

 ante
 
 ---- (quoting
 
 Jenkins
 
 ,
 
 119 F.3d at
 
 1165 );
 
 see also
 

 id.
 

 at ---- (asserting that "Sheriff Chapman was entitled to carry out the policies on which he ran and won with deputy sheriffs who did not oppose his re-election").
 

 The majority further misrepresents
 
 Jenkins
 
 to simply instruct that, "[i]n determining whether the deputy sheriff's duties and responsibilities fall within the
 
 Elrod
 

 -
 

 Branti
 
 exception, ... we look to whether [the] deputy sheriff [was] 'actually sworn to engage in law enforcement activities on behalf of the sheriff.' "
 
 See
 

 ante
 
 ---- (quoting
 
 Jenkins
 
 ,
 
 119 F.3d at
 
 1165 ). According to the majority,
 
 Jenkins
 
 "made clear" that "a sworn deputy sheriff like McCaffrey had a special role in carrying out the law enforcement policies, goals and priorities on which Sheriff Chapman campaigned and prevailed."
 

 Id.
 

 at ----. That is, all that matters to the majority's
 
 Elrod
 

 -
 

 Branti
 
 analysis is that the allegations of the Complaint - indicating that McCaffrey "was a lead investigator of high-profile crimes" and received awards and recognition for his work - establish that "McCaffrey engaged in law enforcement functions on behalf of the sheriff."
 

 Id.
 

 at ----. The majority expressly discounts the fact that, under the Complaint, McCaffrey was neither a policymaker nor a spokesperson for the sheriff's office, and that, pursuant to the Sheriff's General Orders, McCaffrey had circumscribed powers and was not high enough in the chain-of-command to have a policymaking role.
 

 Id.
 

 at ----.
 
 [3]
 

 Of course, as
 
 Jenkins
 
 itself emphasized and our Court has repeatedly recognized over the years,
 
 Jenkins
 
 did not hold that law enforcement responsibilities render any deputy sheriff eligible for political firing. Rather,
 
 Jenkins
 
 actually held that North Carolina deputy sheriffs tasked with law enforcement are policymakers who fall within the
 
 Elrod
 

 -
 

 Branti
 
 exception because, under North Carolina law, they are "the alter ego of the sheriff generally."
 
 See
 

 119 F.3d at 1164
 
 . Before today, the chief criticism of
 
 Jenkins
 
 was that it could be read to authorize the political firings of any and all North Carolina deputy sheriffs, no matter their job responsibilities. But now,
 
 Jenkins
 
 has been interpreted even more broadly and egregiously, to allow the political firings of any and all deputy sheriffs anywhere, so long as they are simply tasked with law enforcement.
 

 In ruling as it does, the majority not only misreads
 
 Jenkins
 
 , but also disregards other controlling precedent of this Court and the Supreme Court. Contrary to our instruction that "low-level policymaking authority does not outweigh an employee's First Amendment rights of political affiliation," the majority has made political firings a possibility for middle- and lower-level government employees.
 
 See
 

 Fields v. Prater
 
 ,
 
 566 F.3d 381
 
 , 387 (4th Cir. 2009) (alterations and internal quotation marks omitted). Merely by performing "law enforcement activities," any beat cop in our bailiwick can now be fired for not having the right political association. Such a result was never contemplated by the Supreme Court in developing what is supposed to be the narrow
 
 Elrod
 

 -
 

 Branti
 
 exception.
 
 See
 

 Rutan v. Republican Party of Ill.
 
 ,
 
 497 U.S. 62
 
 , 74, 76,
 
 110 S.Ct. 2729
 
 ,
 
 111 L.Ed.2d 52
 
 (1990) (explaining that the narrow
 
 Elrod
 

 -
 

 Branti
 
 exception applies to only "certain high-level employees," as "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate"). And it should not be countenanced by our Court.
 

 III.
 

 Conducting a proper assessment of McCaffrey's deputy sheriff position, we can assume under the first prong of our
 
 Stott
 
 test that - "at a very high level of generality,"
 
 see
 

 Fields v. Prater
 
 ,
 
 566 F.3d 381
 
 , 386 (4th Cir. 2009) - the position implicates "partisan political interests or concerns."
 
 See
 

 Stott v. Haworth
 
 ,
 
 916 F.2d 134
 
 , 141 (4th Cir. 1990) (alterations and internal quotation marks omitted). That is, we can rely here on what was apparently the first
 
 Stott
 
 prong analysis in
 
 Jenkins v. Medford
 
 ,
 
 119 F.3d 1156
 
 , 1162-63 (4th Cir. 1997) (en banc) (explaining, inter alia, that deputy sheriffs generally "play a special role in implementing the sheriff's policies and goals," as espoused by the sheriff on the campaign trail).
 
 [4]
 

 Turning to the second
 
 Stott
 
 prong, however, the allegations of the Complaint reveal that McCaffrey did not act as "a policymaker, a privy to confidential information, a communicator, or some other office holder" for whom political considerations are appropriate job requirements.
 
 See
 

 Stott
 
 ,
 
 916 F.2d at 142
 
 (internal quotation marks omitted). McCaffrey's limited realm of investigative duties, although important, neither required nor benefitted from "a particular political philosophy."
 
 See
 

 Lawson v. Union Cnty. Clerk of Court
 
 ,
 
 828 F.3d 239
 
 , 248 (4th Cir. 2016). Furthermore, given the constraints on his job performance and his position at the bottom of Sheriff Chapman's chain of command, McCaffrey's duties did not involve "setting or implementing a policy agenda."
 
 See
 

 id.
 

 at 249
 
 .
 

 That McCaffrey worked on important cases in a "lead" role does not mean that his employment was subject to political considerations.
 
 See
 

 Lawson
 
 ,
 
 828 F.3d at 249
 
 (explaining that supervisory title does not establish that employee was policymaker). Indeed, as we have consistently made clear, "a supervisory employee does not automatically hold a position that is subject to the
 
 Elrod
 

 -
 

 Branti
 
 exception."
 
 See
 
 id.
 

 ;
 
 see also
 

 Fields
 
 ,
 
 566 F.3d at 387
 
 (recognizing that supervisory responsibilities alone do not permit application of
 
 Elrod
 

 -
 

 Branti
 
 exception). A managerial role over a limited number of employees and decisions does not necessitate that a person in such a position has "broad policy setting power."
 
 See
 

 Lawson
 
 ,
 
 828 F.3d at 249
 
 . And because of the strict hierarchy in Sheriff Chapman's office, as well as the levels of approval and screening incorporated therein, McCaffrey merely performed routine investigative tasks and lacked any "broad policy setting power." Although those responsibilities involved "some discretion," discretion does not alone make a deputy a "policymaker," for which political allegiance is an appropriate job requirement.
 
 See
 

 Bland v. Roberts
 
 ,
 
 730 F.3d 368
 
 , 378 (4th Cir. 2013). To conclude otherwise would leave "only the most low-level government employees" protected from political firings.
 
 See
 

 Fields
 
 ,
 
 566 F.3d at 387
 
 .
 

 McCaffrey's achievements and commendations for his exemplary service also do not render him subject to political firing. In 2015 - the year that McCaffrey was terminated because of politics - he received the "Loudoun County Investigator of the Month Award" three times, and also was part of a team designated as "Team of the Month" on three occasions.
 
 See
 
 Complaint ¶ 12. And it was not just his coworkers at the sheriff's office who recognized McCaffrey's good work; the local commonwealth's attorney awarded McCaffrey the "Victim Services Award" in 2014.
 

 Id.
 

 Those commendations show McCaffrey's effectiveness, which was also illustrated by his case closure rate that greatly exceeded the national average.
 

 Id.
 

 But McCaffrey's stellar work does not establish that he possessed the broad discretion that would remove his First Amendment protections and render him subject to the
 
 Elrod
 

 -
 

 Branti
 
 exception. A law enforcement officer can excel in his duties without becoming a
 policymaker. Indeed, it would be odd to permit a law officer to be fired for political reasons because of his success. If anything, the commendations for good work received by McCaffrey show that he performed his duties as a deputy sheriff without exceeding his authority, responded appropriately to his supervisors, and adhered to their orders. On the other hand, McCaffrey's awards fail to show that "there is a rational connection between shared [political] ideology and job performance."
 
 See
 

 Stott
 
 ,
 
 916 F.2d at 142
 
 (internal quotation marks omitted).
 

 Finally, the statutory provisions governing Virginia law enforcement support the conclusion that the
 
 Elrod
 

 -
 

 Branti
 
 exception does not apply here. As we have recognized, "whether state law prohibits politically-based hiring for a particular position is relevant to whether political [allegiance] is necessary for effective job performance."
 
 See
 

 Fields
 
 ,
 
 566 F.3d at 388
 
 (internal quotation marks omitted). And the Virginia Code explicitly prohibits "law-enforcement officers [from] discriminat[ing] against any employee or applicant for employment because of that person's political affiliations or political activities."
 
 See
 

 Va. Code Ann. § 15.2-1512.2
 
 (D). Virginia law also provides that a deputy sheriff may not be prohibited from "voting"; "expressing opinions, privately or publicly, on political subjects and candidates"; "displaying a political picture, sign, sticker, badge, or button"; "participating in the activities of ... a political candidate or campaign"; or "attending or participating in a political convention."
 

 Id.
 

 § 15.2-1512.2(B)-(C). Virginia law thus confirms the impermissibility of McCaffrey being fired for a lack of political loyalty. In these circumstances, McCaffrey is entitled to proceed with his claims.
 
 [5]
 

 IV.
 

 Pursuant to the foregoing, I would vacate the district court's dismissal of McCaffrey's Complaint and remand for further proceedings.
 

 I therefore respectfully dissent.
 

 In his Complaint, McCaffrey alleges four claims, each premised upon his termination by Sheriff Chapman due to McCaffrey's support of Chapman's political opponent. McCaffrey pursues two claims against Chapman, primarily a
 
 42 U.S.C. § 1983
 
 claim for contravention of McCaffrey's rights under the First Amendment, plus an equivalent state claim for violation of the Virginia Constitution. McCaffrey also alleges derivative claims against Loudoun County and its Board of Supervisors.
 

 Because the Sheriff's General Orders are incorporated into the Complaint by reference, they are properly considered here.
 
 See
 

 Tellabs, Inc. v. Makor Issues & Rights, Ltd.
 
 ,
 
 551 U.S. 308
 
 , 321,
 
 127 S.Ct. 2499
 
 ,
 
 168 L.Ed.2d 179
 
 (2007).
 

 As the majority would have it,
 
 Jenkins
 
 and our subsequent precedent have established a test under which a deputy sheriff is either subject to political firing because he is tasked with law enforcement, or protected from political firing because he is a low-level jailer whose duties are "custodial."
 
 See
 

 ante
 
 ---- - ---- (reasoning that "the
 
 Elrod
 

 -
 

 Branti
 
 exception applies to McCaffrey" because his Complaint "leave[s] no doubt that he was a deputy sheriff engaged in law enforcement activities and was not performing 'custodial' duties like the deputies in [
 
 Bland v. Roberts
 
 ,
 
 730 F.3d 368
 
 (4th Cir. 2013), and
 
 Knight v. Vernon
 
 ,
 
 214 F.3d 544
 
 (4th Cir. 2000) ]");
 
 see also
 

 id.
 

 at ---- n.5. Nonetheless, there is no support for such a simplistic test in
 
 Jenkins
 
 ,
 
 Bland
 
 , or
 
 Knight
 
 , which all recognize that the
 
 Elrod
 

 -
 

 Branti
 
 analysis requires an examination of the specific duties of the particular position at issue to assess whether political loyalty is an appropriate job requirement.
 

 My willingness to assume that the first
 
 Stott
 
 prong has been satisfied should not be interpreted as an endorsement of the
 
 Jenkins
 
 analysis. I have serious doubts as to whether that analysis was too general, and whether it should have focused more on deputies with the job responsibilities of the plaintiffs. Here, that would mean looking at boots-on-the-ground investigators of violent crimes like McCaffrey. I question whether such a deputy can ever make decisions that leave room for political disagreement, as we should always adhere to the principle that "[p]olitics should not be an active ingredient of good law enforcement."
 
 See
 

 Mitchell v. Thompson
 
 ,
 
 18 F.3d 425
 
 , 428 (7th Cir. 1994) (Wood, J., dissenting). In any event, I certainly do not sanction the panel majority's analysis, which focused on McCaffrey specifically but invented facts in so doing. Notwithstanding the Complaint's silence as to Sheriff Chapman's campaign platform, the majority pronounces that "Chapman won an election for sheriff after espousing positions on how the [sheriff's office] should be run," and that McCaffrey's "duties and responsibilities involved carrying out ... Chapman's policies and priorities."
 
 See
 

 ante
 
 ----.
 

 As a final point, the majority has implicitly ruled that the district court erred in failing to assess McCaffrey's claims under the
 
 Pickering
 
 and
 
 Connick
 
 decisions.
 
 See
 

 Pickering v. Bd. of Educ.
 
 ,
 
 391 U.S. 563
 
 ,
 
 88 S.Ct. 1731
 
 ,
 
 20 L.Ed.2d 811
 
 (1968) ;
 
 Connick v. Myers
 
 ,
 
 461 U.S. 138
 
 ,
 
 103 S.Ct. 1684
 
 ,
 
 75 L.Ed.2d 708
 
 (1983). Rather than remand to rectify that error, however, the majority itself has conducted the fact-intensive
 
 Pickering
 

 -
 

 Connick
 
 analysis and resolved the issue in favor of the defendants. It bears emphasizing that "we are a court of review, not of first view."
 
 See
 

 Lovelace v. Lee
 
 ,
 
 472 F.3d 174
 
 , 203 (4th Cir. 2006) (quoting
 
 Cutter v. Wilkinson
 
 ,
 
 544 U.S. 709
 
 , 718 n.7,
 
 125 S.Ct. 2113
 
 ,
 
 161 L.Ed.2d 1020
 
 (2005) ).